103 S.W.3d 407 (2003)
In the Matter of the CARE AND TREATMENT OF Troy L. SPENCER.
Troy L. Spencer, Respondent-Appellant,
v.
State of Missouri, Petitioner-Respondent.
No. 24596.
Missouri Court of Appeals, Southern District, Division Two.
April 29, 2003.
*408 Nancy L. Vincent and Dave Hemingway of St. Louis, MO., and Emmett D. Queener of Columbia, MO, for Appellant.
Jeremiah W. (Jay) Nixon, Atty. Gen., and James R. Layton, Assistant Attorney General, for Respondent.
JAMES K. PREWITT, Presiding Judge.
Following a bench trial, Troy Spencer ("Appellant") was found to be a sexually *409 violent predator pursuant to § 632.480, RSMo 2000, and ordered committed to the custody of the Director of the Department of Mental Health for "care and treatment until such time as [Appellant's] mental abnormality has so changed that he is safe to be at large."
Appellant raises five points relied on, including that the trial court erred by entering judgment without first considering whether, as a result of a mental abnormality, Appellant had serious difficulty controlling his behavior. In his other points, Appellant contends that the trial court erred by failing to assure that his waiver of counsel was knowing and intelligent and in failing to comply with the written waiver requirement of § 600.051, RSMo 2000; by allowing the testimony of a doctor who conducted a second evaluation of Appellant because the sexually violent predator ("SVP") statute does not afford the State the opportunity for more than one evaluation of a detainee; by entering judgment finding Appellant to be a SVP because the State had introduced evidence about narcissistic personality disorder ("NPD"), which was irrelevant to claims alleged in the petition; and by failing to dismiss the case because the prosecuting attorney for Scott County did not participate in the prosecutor's review committee that voted to commence SVP proceedings against Appellant.
In 1985, Appellant pled guilty to sodomy and received a fifteen-year sentence. The conduct that provided the basis for the charge was Appellant sexually abusing his daughter for at least four years, beginning when she was just six years old, by forcing her to perform oral sex on him. During the pre-sentence investigation for that crime, Appellant also admitted to sexually molesting his sister when she was nine and he was sixteen. Records indicated that Appellant had sexual intercourse with a sixteen-year-old when he was twenty-two, during which he psychologically pushed the "virginal" female into intercourse, and that he also had intercourse with a fourteen-year-old while he was in the military.
Between 1994 and 2000, Appellant was placed into the Missouri Sex Offender Program ("MoSOP") four times, and each time was subsequently terminated from the program or refused to participate. In December of 2000, an end-of-confinement report was prepared by Craig McIntosh, a licensed clinical social worker and therapist with MoSOP. Within it, McIntosh noted that Appellant refused to participate in a clinical interview regarding his status as a potential SVP. Based on the information contained in or reviewed for the report, McIntosh diagnosed Appellant with pedophilia and NPD and concluded that Appellant may meet the criteria of a SVP under § 632.480(5), RSMo 2000.
On January 10, 2001, Appellant's records were reviewed by a multidisciplinary team pursuant to § 632.483.4, RSMo 2000, and the majority found that Appellant did not meet the definition of a sexually violent predator. On January 16, 2001, pursuant to § 632.483.5, RSMo 2000, the prosecutor's review committee reviewed the matter and concluded, by a majority vote, that Appellant met the definition of a sexually violent predator. The Scott County prosecutor did not participate in the prosecutor's review committee meeting, but was represented by a designee.
On January 19, 2001, the Attorney General's Office filed a petition requesting that the trial court find cause to believe that Appellant is a SVP, order him to be taken into custody by the sheriff of Scott County and transferred to a secure facility, set a hearing date for a finding of probable cause, and, if probable cause was found, to hold a trial on the merits. The probable cause hearing was held, and on March, 8, *410 2001, the trial court found probable cause that Appellant is a SVP and ordered that he be evaluated pursuant to § 632.489.4, RSMo 2000, to determine whether he suffers from a mental abnormality and, if so, whether that mental abnormality makes him more likely than not to engage in predatory acts of sexual violence. The trial court's order included the definition from § 632.480(3), RSMo 2000, which defines predatory acts as "acts directed toward strangers or individuals with whom relationships have been established or promoted for the primary purpose of victimization."
The evaluation ordered by the trial court pursuant to § 632.489.4, RSMo 2000, was conducted by Dr. Bruce Harry, a psychiatrist. However, Dr. Harry was limited to a review of the associated records because Appellant refused to consent to be interviewed or participate in any way in the evaluation. In his report filed May 17, 2001, Dr. Harry concluded that Appellant suffered from two mental abnormalities, pedophilia and NPD, but that, given the definition of predatory acts, Appellant did not satisfy the specific requirement that he is more likely than not to engage in predatory acts of sexual violence.
The State filed a motion to permit a second evaluation and asked the trial court to order Appellant to cooperate in the second evaluation. The court granted the State's motion for the second evaluation to be conducted by Dr. Harry Hoberman, a clinical and forensic psychologist, but indicated that it could not compel Appellant to cooperate with the evaluation. Dr. Hoberman did conduct an evaluation, but also was limited to a review of the essential documents, as Appellant refused to be interviewed. Dr. Hoberman concluded that Appellant suffered from the mental abnormalities of pedophilia and NPD, and that those conditions made it more likely than not that Appellant would re-offend. It was Dr. Hoberman's opinion that Appellant was a SVP.
During hearings held on various pre-trial motions, Appellant expressed that he no longer wanted to be represented by the public defender assigned to his case, and that further, he no longer wanted any legal representation as he felt that neither the public defender "nor any other attorney, would be able to argue [the motions and his case] as well or as clearly for the [c]ourt's benefit as [Appellant] could." When Appellant was questioned as to whether he understood that he had the right to counsel and that another attorney would be appointed to represent him at no cost, he expressed that he understood his rights but requested that the trial court allow the current public defender to withdraw and Appellant to represent himself. After hearing argument from all sides, including from the public defender that his office would not allow him to serve as second chair in the proceedings to provide assistance to Appellant, the trial court sustained the public defender's motion to withdraw and Appellant's request to represent himself.
In addition to requesting that he be allowed to represent himself, Appellant also asked that the hearing be converted into a bench trial. Appellant requested that the State "agree to convert this hearing into a bench trial and make [its] arguments and present them and [Appellant] will make [his] statement, and we will let [the judge] make his decision today and conclude this matter." The trial judge questioned Appellant as to whether he indeed wanted to waive his right to a jury trial, to which Appellant responded, "What I had agreed to, sir, is for conclusion today." However, Appellant then proceeded to ask the trial court to set a tentative date for the bench trial. The State, who had *411 originally requested the jury trial, asked for some time to consider its options, indicating that if Appellant wished to waive jury trial, the State might be amenable to that. The trial court left the matter open to provide the State time to respond.[1]
A bench trial was held on September 20-21, 2001, and among the State's witnesses were Dr. Harry, Dr. Hoberman, and McIntosh. Viewed in the light most favorable to the judgment, the State's evidence was as follows. Dr. Harry, who had also assessed Appellant in 1988, reiterated the diagnoses of pedophilia and NPD, which were from his evaluation of Appellant conducted for the trial. Dr. Harry considered both the pedophilia and NPD to be mental abnormalities. Dr. Harry testified that, based on Appellant's interactions with his daughter and sister, he met the criteria of pedophilia, which include a sexual attraction over a period of at least six months involving sexually-arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child typically age thirteen or younger. Dr. Harry indicated that the attraction associated with pedophilia could be to adults as well. According to Dr. Harry, the pedophile is generally at least sixteen years old and five years older than his victims.
As for the NPD, which Dr. Harry defined as "a pervasive sense of what's called grandiosity or need for admiration and a lack of empathy," Appellant exhibited at least five of the nine different kinds of grandiosity or needs for admiration. These criteria include a grandiose sense of self-importance; preoccupation with fantasies of unlimited success or power; belief that one is unique and only capable of understanding by those of special or high status; requirement of excessive admiration; sense of entitlement; interpersonal "exploitativeness" or taking advantage of others to one's own ends; lack of empathy or an unwillingness to recognize or identify with the feelings and needs of others; envy of others or the belief that others are envious of him; and show of arrogant or haughty behaviors and attitudes.
Appellant's behaviors and attitudes that matched NPD criteria included his arrogance toward other inmates and expression that he was better than them and undeserving of the treatment and incarceration he was receiving; his demands for special privileges; lack of empathy demonstrated by his descriptions of his offenses against his daughter; and his need to be the center of attention and have others look up to him.
According to Dr. Harry, the pedophilia affects Appellant's volitional capacity, as it "gives rise to the impulses to be involved with children .... and makes it impossible to control in the long term." Dr. Harry testified that the NPD affected the emotional component more than the volitional in that "there is no emotional incentive to *412 treat other people as equals, but rather just objects to be used and disposed of as needed and at will."
Dr. Harry opined that the mental abnormalities from which Appellant suffers make him more likely to engage in sexually violent offenses. Both in his 1988 assessment and his evaluation of Appellant for this proceeding, Dr. Harry determined that Appellant's risk of sexually re-offending was exceedingly high. Dr. Harry's only question was who Appellant's later victims would be and whether they would be from within his family or outside of it. This question led to Dr. Harry's difficulty with concluding that Appellant was a SVP, because the definition of predatory is focused on "acts directed toward strangers or individuals with whom relationships have been established or promoted for the primary purpose of victimization." Section 632.480(3), RSMo 2000.
Dr. Hoberman, who conducted the second evaluation of Appellant, also determined that Appellant suffered from the mental abnormalities of pedophilia and NPD. He testified that both of the mental abnormalities make Appellant more likely to re-offend in a sexual manner. Unlike Dr. Harry, Dr. Hoberman was of the opinion that Appellant was a SVP and more likely than not to engage in predatory acts of sexual violence.
Dr. Hoberman found Appellant's sexual offending behavior and sexual acting out as predatory in nature. Dr. Hoberman pointed not only to the offenses Appellant committed against his daughter and sister, but also to the incidents involving a sixteen-year-old and a fourteen-year-old. To Dr. Hoberman, all of the incidents were indicative of pedophilia as Appellant offended against his daughter and sister because they were available to him, but he also offended against other minor females when that situation presented itself. Dr. Hoberman agreed that in terms of later predatory acts, there perhaps were no incest victims left for Appellant to act against; however, Dr. Hoberman presented results from studies that show incest offenders tend to have extra-familial victims as well, that there often is a "substantial crossover effect."
In terms of re-offending, Dr. Hoberman found various risk factors, including Appellant's failure to complete the MoSOP program; lack of remorse; behavioral violations while incarcerated; and hypersexuality. According to Dr. Hoberman, the hypersexuality makes Appellant more likely to act on his pedophilia. On the Sex Offender Risk Appraisal Guide, Appellant showed a 60% chance of re-offending within ten years. Two other scales used by Dr. Hoberman showed that Appellant has characteristics that would indicate a relatively high likelihood of sexually offending into the indefinite future. Dr. Hoberman clarified that when he referred to sexually offending, he meant "in a sexually violent way[,] in a predatory way."
McIntosh, the licensed clinical social worker who wrote the end of confinement report, also testified for the State. He testified that of the seventy evaluations he had completed, he had forwarded seven or eight who met criteria of a SVP for further review. Similar to Dr. Harry and Dr. Hoberman, Appellant refused to be interviewed for McIntosh's evaluation. McIntosh diagnosed Appellant with pedophilia and NPD.
In terms of risk factors to re-offend, McIntosh found that those included Appellant's early onset of offending behavior, which began by at least age sixteen, and Appellant's willingness to go outside of the family to offend and have his needs met. The latter was shown by Appellant's admission that he "psychologically pressured" a sixteen-year-old into having sexual *413 intercourse with him when he was twenty-two, as well as his sexual intercourse with a fourteen-year-old when he was in the military.
Appellant testified on his own behalf at the trial. When asked on cross-examination about the pedophilia and whether he had sexually abused his daughter, Appellant replied, "In the nature that I walked in at that time, sir, yes, I did." Appellant was then asked about an affidavit he had filed with the court in which he "rescinded any and all admissions of ever committing a sex offense and swore under penalty of perjury ... he has no memory of committing a sex offense." Appellant's response was that his mind had been renewed and that his "new mind has no memory of an evil act." When asked by the trial court whether his old mind had any memory of an evil act, Appellant responded, "It's dead."
On September 28, 2001, the trial court entered its judgment and commitment order, finding Appellant, "beyond a reasonable doubt, to be a sexually violent predator." The judgment ordered Appellant "committed to the custody of the director of the Department of Mental Health for control, care and treatment until such time as [his] mental abnormality has so changed that he is safe to be at large." This appeal followed.
In Appellant's first point, he contends that the trial court erred and abused its discretion when it entered its judgment without first considering whether, as a result of a mental abnormality, Appellant had serious difficulty controlling his behavior. Appellant argues he was prejudiced by this alleged error because the State failed to prove Appellant had serious difficulty controlling his behavior and the trial court failed to specifically find that Appellant had such serious difficulty, which is a "necessary predicate" to finding Appellant to be a SVP.
Appellant's point is based on recent United States Supreme Court decisions and the application of those decisions by Missouri courts. See Kansas v. Crane, 534 U.S. 407, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002); Kansas v. Hendricks, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997); Thomas v. State, 74 S.W.3d 789 (Mo.banc 2002). See also, e.g., In re the Care and Treatment of Smith, 83 S.W.3d 116 (Mo.App.2002); Love v. State, 90 S.W.3d 236 (Mo.App.2002).
The Missouri Supreme Court determined that issues raised in Thomas were controlled by the Crane and Hendricks decisions. Thomas, 74 S.W.3d at 790. In Crane, the United States Supreme Court found that reading its previous ruling in Hendricks to require a finding that a dangerous individual be completely unable to control his behavior was too restrictive. Crane, 534 U.S. at 413, 122 S.Ct. at 867, 151 L.Ed.2d at 856. Rather, the Court determined that, "It is enough to say that there must be proof of serious difficulty in controlling behavior." Id.
In Thomas, the Missouri Supreme Court applied the principles from Hendricks and Crane to the Missouri SVP statute and determined that the statute is constitutional provided any mental abnormality suffered by the persons causes the individual serious difficulty in controlling his or her behavior. Thomas, 74 S.W.3d at 791. Therefore, addressing the issue at hand in Thomas, the Missouri Supreme Court concluded that for a jury instruction to be constitutional under the United States Supreme Court cases, it must define mental abnormality in such a way as to require that the degree to which an individual cannot control his or her behavior is at the level of serious difficulty. Id. at 792. Thus, the Thomas court reversed the judgments *414 before it (two cases in which individuals had been found to be SVPs were consolidated in Thomas) and remanded the causes for new trials with directions that the jury instruction must read as follows:
As used in the instruction, "mental abnormality" means a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to commit sexually violent offenses in a degree that causes the individual serious difficulty in controlling his behavior.

Id.
Since the decision in Thomas, cases in Missouri that had used the same instruction found to be erroneous and unconstitutional in Thomas have been reversed and remanded for new trials with directions that the jury be instructed in accordance with Thomas. See, e.g., Smith, 83 S.W.3d at 118 (Mo.App.2002); Love, 90 S.W.3d at 237-38. Here, however, Appellant raises the issue and the effect of Crane, Hendricks, and Thomas not on a jury trial, but rather on a bench trial. This has not yet been addressed in Missouri. We will use the progeny of cases noted above, as well as cases from other states that have addressed the issue in bench trials, to aid in our analysis.
States that have addressed the issue raised by Appellant have not had complete consensus on the appropriate manner in which to apply Crane and Hendricks. The Supreme Court of New Jersey considered a case in which the trial court held that the record before it "contained clear and convincing evidence that [the individual] was unable to control his dangerous sexual behavior and that he was likely to commit additional sexual offenses in the reasonably foreseeable future." In re the Commitment of W.Z., 173 N.J. 109, 801 A.2d 205, 209 (2002). W.Z. appealed, contending that a finding that he was unable to exercise volitional control over dangerous sexual behavior was required. Id.
The New Jersey Supreme Court discussed how Crane did not require a finding of a total lack of capacity to control, only that the individual had serious difficulty in controlling behavior. Id at 215. The Court determined, based on New Jersey's SVP statute and an analysis of its legislative intent, that the serious difficulty standard is met when an individual is "found, by clear and convincing evidence, to have serious difficulty in controlling his or her harmful behavior such that it is highly likely that the individual will not control his or her sexually violent behavior and will [re-offend]." Id. at 217.
The New Jersey Supreme Court determined that meeting this standard was an additional requirement for the State to prove. Id. at 218. Therefore, the Court remanded the cause to the trial court for further proceedings in light of that additional requirement and with directions for the trial court to make a determination whether the individual's mental abnormality causes him to have serious difficulty in controlling his sexually violent behavior. Id. at 219.
In a case from South Carolina, the trial court, following a bench trial, determined that the State failed to meet its burden that the individual was a sexually violent predator. In re the Treatment and Care of Luckabaugh, 351 S.C. 122, 568 S.E.2d 338, 341 (2002). The South Carolina Supreme Court vacated that portion of the judgment and remanded for a new hearing. Id. at 344. The Court in Luckabaugh noted that the trial court's order failed to provide findings of fact to support its ultimate legal conclusion that Luckabaugh was not a sexually violent predator. Id. at 343.
*415 As with other cases noted, Luckabaugh referenced the Crane decision and that it required a court to make a lack-of-control determination, specifically that there was proof that the individual had serious difficulty controlling his or her behavior, before involuntarily committing someone. Id. at 348. However, the South Carolina Supreme Court did not accept that Crane mandated a court to make a separate and specific lack-of-control determination, "only that a court must determine the individual lacks control while looking at the totality of the evidence." Id. To read Crane to require such a mandate, according to Luckabaugh, "would be to suggest the United States Supreme Court mandated at least sixteen states to hold new commitment hearings for over 1,200 individuals committed under their state's sexually violent predator acts." Id.
In another South Carolina case, the trial court determined that the individual was a sexually violent predator. In re the Care and Treatment of Kennedy, 353 S.C. 394, 578 S.E.2d 27-29 (2003). Kennedy appealed, contending that the trial court erred because the State failed to prove beyond a reasonable doubt that he was a sexually violent predator and could not control his behavior. Id.
The Kennedy court noted that there was not a requirement under Crane that the individual have a total or complete lack of control. Id. 578 S.E.2d at 29. However, the court went on to specify that Crane did not allow civil commitment without any lack of control determination. Id. at 29. The court referenced the standard from Luckabaugh in which a trial court is required to determine whether an individual has serious difficulty with controlling behavior while considering the totality of the evidence. Id. at 29.
In Kennedy the evidence was that the individual suffered from pedophilia and that he had the propensity to commit future acts on children because of the illness. Id. at 28. One of the experts testified that Kennedy denied the events surrounding his original conviction for committing a lewd act on a child. Id. at 27, 28. On appeal, the court found that because Kennedy suffered from pedophilia, there was inherent evidence that he suffered from an inability to control his own behavior because pedophilia was "a mental abnormality that critically involves what a lay person might describe as a lack of control." Id. at 29, quoting Crane, 534 U.S. at 414, 122 S.Ct. 867. Therefore, the trial court's judgment was affirmed and no further findings were required. Id. at 29.
The discussion in Crane of pedophilia actually referred to Hendricks, the first of the two United States Supreme Court cases. In Hendricks, those who evaluated Hendricks diagnosed him as suffering from pedophilia, and Hendricks himself testified that he was unable to control his urges and therefore, admitted to a lack of volitional control. Hendricks, 521 U.S. at 360, 117 S.Ct. 2072. According to the United States Supreme Court, this sufficed for due process purposes and no jury instruction issue was addressed. Id.; see also Thomas, 74 S.W.3d at 791.
With the analysis of the cases from the United States Supreme Court, as well as those cases in other states that applied Crane and Hendricks to bench trials, we come back to language in cases from Missouri that, even though from jury trials, is instructive to our analysis. In Smith and Love, this Court remanded the causes to the trial court for new trials with directions that the juries be instructed in accordance with Thomas and include the serious difficulty standard. Smith, 83 S.W.3d at 118; Love, 90 S.W.3d at 238.
In another case, In re Johnson, 58 S.W.3d 496 (Mo.banc 2001), the Missouri *416 Supreme Court found that the testimony of one of the State's experts was improperly admitted and by excluding that evidence, the State failed to make a submissible case that the individual was a sexually violent predator. Id. at 499. The cause was remanded for a new trial because, although that witness' testimony was not admissible, there might be other evidence that the State could present to make a submissible case. Id. at 500.
In Love, we used a similar analysis as a basis for remand. As Thomas was not decided at the time of the trial in Love, we noted that the proper definition for mental abnormality, which included reference to the individual having serious difficulty in controlling his behavior, was unknown and unavailable to the trial court. Love, 90 S.W.3d at 238. Therefore, it was unfair to require that either the trial court or the State anticipate the outcome in Thomas. Id. We concluded that although the State's evidence was insufficient to meet the Thomas standard, the record indicated that the State had other evidence that may allow it to make a submissible case under the Thomas standard and, therefore, remand for a new trial, rather than outright reversal, was appropriate. Id.
In our case here, there was sufficient evidence that Appellant suffered from pedophilia; evidence he does not question in any of his points relied on. Under some readings of Hendricks or Kennedy (from South Carolina), the pedophilia diagnosis, given that within its definition is an inherent lack of volitional control, could lead to a denial of Appellant's Point I under which he requests either an outright reversal of his commitment or a remand for a new hearing and the requirement that the trial court specifically determine whether he had serious difficulty controlling his sexually violent behavior.
A Missouri case does provide us some instruction in this area. See In re Care and Treatment of Coffman, 92 S.W.3d 245, 253 (Mo.App.2002). The case involved a jury trial, and the Coffman court discussed cases from other jurisdictions including an Illinois case in which the trial court's failure to instruct on lack of volitional control under the circumstances where the person suffered from pedophilia was not reversible error. Id. It was determined that Missouri and Illinois apparently did not agree on this question, because "Thomas did not indicate that it would recognize any exceptions to its requirement that the jury instruction on mental abnormality require a finding of serious difficulty." Id. Thus, in Missouri, a pedophilia diagnosis does not automatically equal a finding of serious difficulty by a jury, and we see no reason to distinguish that for a bench trial.
Based upon our reading of the cases analyzed above, including those that involved jury trials in Missouri, we determine that the judgment of the trial court should be reversed and the cause remanded to allow the State the opportunity to present evidence and make a submissible case under the Thomas standard. As Thomas was not the controlling law at the time of trial, we will not penalize the State for any failure to offer evidence showing that Appellant has serious difficulty in controlling his sexually violent behavior. See Love, 90 S.W.3d at 238.
One of the State's experts, Dr. Hoberman, did address volitional capacity in his testimony, but the State may have other evidence to present on this issue. Appellant also may have evidence to present on the issue. In addition, we agree with the standard as stated in jury trials concerning the correct application of Thomas, that regardless of whether there was sufficient evidence, if the issue is contested, a new trial is required so as to properly instruct *417 the jury. Coffman, 92 S.W.3d at 253. Given the circumstances of the case here, we apply a similar standard, in that we need not address whether there was sufficient evidence.
As this was a bench trial, our general standard is to presume that any fact issues on which no specific findings were made were found in accordance with the result. Rule 73.01(c); Kleeman v. Kingsley, 88 S.W.3d 521, 522 (Mo.App.2002). Thus, there may be some support for an argument to simply affirm the trial court's judgment based on the above standard. However, given that Thomas was not yet decided and thus not controlling at the time of trial, assuming that any finding regarding serious difficulty was made in accordance with the result would be unfair and improper since such was not a fact at issue or contested at trial. Similar to our analysis in Love, the Thomas standard was unknown and unavailable to the trial court, and it would be unfair to require that the trial court, the State, or the Appellant anticipate the outcome in Thomas. Love, 90 S.W.3d at 238.
Appellant's request for a bench trial was made late in the process, late enough that the record indicates that jury instructions had been submitted by the State. In particular, the State submitted an instruction that included the definition of mental abnormality found deficient in Thomas, 74 S.W.3d at 790, 792. This bolsters the fact that no one was aware of the requirement to show Appellant had serious difficulty controlling his behavior.
Following the reversal and remand for a new trial, we encourage the trial court to make a specific finding in line with the Thomas standard; however, we agree with the analysis from the South Carolina Supreme Court where it did not accept that Crane mandated a court to make a separate and specific lack of control determination, "only that a court must determine the individual lacks control while looking at the totality of the evidence." Luckabaugh, 568 S.E.2d at 348.
Appellant's Point I has merit and may be considered dispositive. However, we will address his other issues, as many of them will likely be raised within the new proceedings.
In Point II, Appellant contends that the trial court erred and abused its discretion in failing to assure that his waiver of counsel was knowing and intelligent. Appellant further argues that the trial court erred by failing to comply with the written waiver requirements of § 600.051, RSMo 2000.
This Court has previously determined that the SVP statute outlines a special statutory proceeding under which an individual is afforded a series of rights available to defendants in a criminal prosecution. In re Care and Treatment of Salcedo, 34 S.W.3d 862, 867 (Mo.App. 2001). These rights include the right to appear in person and be represented by counsel. Id.
Whether the SVP proceedings are considered criminal, which would allow the application of § 600.051, RSMo 2000, and therefore impose the requirement that there be a written waiver of the right to counsel, is another question. See In re D.L., 999 S.W.2d 291, 293 n. 1 (Mo.App. 1999). In a case where the issue involved the right to waive a jury trial in a SVP proceeding, it was determined that the SVP statute was "consistent with the law applicable to civil cases generally." Nixon, 27 S.W.3d at 838.
Missouri also distinguishes between civil and criminal commitment, where criminal commitment proceedings are those where a person has been charged with a criminal offense and asserts he or she is not liable *418 for that offense by reason of mental disease or defect. State v. Kee, 510 S.W.2d 477, 480 (Mo.banc 1974). The distinction is similar to proceedings before a juvenile court, such as in a case heard where the acts committed by a juvenile would have been assaults if committed by an adult. D.L., 999 S.W.2d at 293. In D.L., the analysis involved the recognition that, since it was not a criminal proceeding, § 600.051, did not apply. Id. at 293 n. 1.
Therefore, we conclude that proceedings under the SVP statute are not criminal, although they may be considered of a special statutory nature. Salcedo, 34 S.W.3d at 867. Thus, § 600.051, RSMo 2000, does not apply here, and there is no requirement that Appellant's waiver of counsel be written. Appellant's waiver, however, must still be knowing and intelligent.
Although Missouri has not addressed the issue of waiver of counsel in a SVP case, the standard used in criminal proceedings is of use to our analysis, in that the voluntariness of waiver in such cases is considered under a totality of the circumstances standard, where a knowing and intelligent waiver depends on the specific facts and circumstances of the case. State v. Schnelle, 924 S.W.2d 292, 296 (Mo.App. 1996). Other states have addressed the issue within proceedings under their SVP acts and have used a similar standard. See, e.g., People v. Leonard, 78 Cal. App.4th 776, 788, 93 Cal.Rptr.2d 180 (Cal. App.2000); State v. Chamley, 568 N.W.2d 607, 618 (S.D.1997).
In Chamley, the South Dakota Supreme Court noted that an individual's request to represent himself must be unequivocal in nature. Chamley, 568 N.W.2d at 618. Chamley was adamant in his request to represent himself pro se, yet the trial court forced him to accept representation by an attorney, which the South Dakota Supreme Court found was reversible error. Id. at 618-19. Chamley had asserted his constitutional right to represent himself with an unequivocal demand and there was no evidence that he did so for the purpose of disrupting or delaying the trial. Id.
In Leonard, the individual requested a continuance to obtain new counsel, which was denied by the trial court because it determined the request was untimely and for the purpose of delaying the proceedings. Leonard, 78 Cal.App.4th at 788-89, 93 Cal.Rptr.2d 180. The trial court gave Leonard the option of keeping his original attorney or proceeding pro se. Id. at 789, 93 Cal.Rptr.2d 180. Leonard decided to proceed on his own, but stated that he was forced to do so based on the trial court's ruling. Id. The Leonard court concluded that the trial court did not abuse its discretion, because once an individual decides to proceed to trial with representation from counsel and the trial has begun, it is within the trial court's discretion whether to allow that individual to dismiss counsel and proceed pro se. Id. at 788, 93 Cal.Rptr.2d 180.
The circumstances surrounding Appellant's waiver of counsel were outlined earlier in this opinion. Appellant's demand to allow his counsel to withdraw and represent himself, rather than allow the court to assign new counsel, was unequivocal. He made it clear that he, and only he, could adequately present his case to the court. Under the totality of the circumstances here, the trial court might have abused its discretion if it had denied Appellant his constitutional right to represent himself at that point. Point II is denied.
In Point III, Appellant argues that the trial court erred and abused its discretion by allowing Dr. Hoberman to testify because the SVP statute does not afford the right for the State to obtain more than one evaluation of a detainee. Under *419 § 632.489.4, RSMo 2000, after a probable cause determination is made, the individual is to be evaluated by a psychologist or psychiatrist.
Appellant is correct that the plain language of the statute would have allowed him to obtain his own evaluation, as the statute states that "[i]n addition, such person may be examined by a consenting psychiatrist or psychologist of the person's choice at the person's own expense." § 632.489.4, RSMo 2000. Appellant argues, however, that the State is not afforded the same opportunity under the statute.
Although the SVP statute does not explicitly say that the State is allowed any additional evaluations, the last two sentences of the section state: "One examination shall be provided at no charge by the department [of mental health]. All costs of any subsequent evaluations shall be assessed to the party requesting the evaluation." Section 632.489.4, RSMo 2000. Although we agree that the plain language of the statute does not mention the right of the State to request additional examinations, such a right is implicit in the language of the statute. See In re Marriage of Gardner, 683 S.W.2d 311, 312 (Mo.App. 1984).
Appellant directs our attention to the SVP statute from the state of Washington and cases that have interpreted it. Wash. Rev.Code. § 71.09.040 (2003); see also In re Detention of Williams, 147 Wash.2d 476, 55 P.3d 597 (2002). Although Appellant indicates that Washington's SVP statute is "virtually identical" to Missouri's, within the provision regarding evaluations following the probable cause hearing, it is not. The Washington statute only specifically refers to the one evaluation directed by the trial court and does not contain language that allows for any additional evaluations, regardless of which party requests them. Thus, we do assign the persuasive value to the Washington statute and cases that Appellant suggests.
It is also important to our analysis that Appellant was uncooperative in each of the evaluations conducted for the trial, as well as the evaluation conducted for the end-of confinement report. In a Kansas case, when the appellant challenged the sufficiency of the evidence and argued that the diagnoses of the experts were based on speculative and tenuous evidence, the court determined that his point of error was in effect invited error, because he had refused to cooperate in the evaluations. In re Care and Treatment of Blackmore, 30 Kan.App.2d 90, 39 P.3d 89, 94 (2002).
We can make a similar statement here based on Appellant's refusal to cooperate. The State was within its rights to request a second evaluation and the trial court did not err or abuse its discretion by allowing the evaluation or the subsequent testimony from the evaluator. Point III is denied.
In Point IV, Appellant contends that the trial court erred in its judgment and order of commitment by allowing the introduction of evidence related to NPD. At trial, Appellant did not object to this evidence as being beyond the scope of the pleadings. When a party does not object to evidence on an issue that is beyond the scope of the pleadings, the pleadings are automatically amended to conform to the evidence. In re J.M.S., 83 S.W.3d 76, 86 (Mo.App.2002). Further, alleged error is only reversible error if it is both error and prejudicial. Bank of America, N.A. v. Stevens, 83 S.W.3d 47, 56 (Mo.App.2002).
Appellant does not challenge the sufficiency of the evidence with regard to pedophilia, which was explicitly indicated in the petition and which was the other mental abnormality with which he was diagnosed and for which evidence was presented at trial. Therefore, even if the State was *420 required to specifically demarcate NPD in its petition, which we do not need to address, and even if Appellant had objected to the evidence of NPD, we fail to see how Appellant was prejudiced by the introduction of the evidence on NPD. Point IV is denied.
In his final point, Appellant contends that the trial court erred and abused its discretion by failing to dismiss the case because the prosecuting attorney for Scott County, Cristy Baker-Neel, did not participate in the prosecutor's review committee. An assistant prosecuting attorney for Scott County participated instead as Ms. Baker-Neel's designee. According to § 632.483.5, RSMo 2000, "one member [of the prosecutor's review committee] shall be the prosecuting attorney of the county in which the person was convicted."
Scott County is classified as a third-class county, and under § 56.240, RSMo 2000, "[a]n assistant prosecuting attorney shall discharge the duties of the prosecuting attorney when the prosecuting attorney is sick or absent from the county, or when the prosecuting attorney is engaged in the discharge of the duties of his [or her] office so that he [or she] cannot attend."
In our research, we discovered a fact that Appellant neglected to mention in this point, but which is contained among the 334 pages of the legal file. Apparently, Appellant was represented by Ms. Baker-Neel in her former capacity as a public defender during the sentencing phase of his conviction. We find this significant because during the trial, Appellant alluded to a problem he had with his sentencing, which occurred in 1985. Thus, had Ms. Baker-Neel participated in the prosecutor's review committee, Appellant may have contended her participation was inappropriate or prejudicial. Similar to our statement within the analysis of Point III, we find Appellant's contentions in Point V akin to invited error.
Given the totality of the circumstances and the language of § 56.240, RSMo 2000, we find that there was no error or prejudice toward Appellant by Ms. Baker-Neel sending a designee to participate in the prosecutor's review committee. Further, we find that nothing in § 632.483.5, RSMo 2000, precludes a designee in such a situation.
The judgment is reversed and the cause remanded for a new trial with directions for the trial court to proceed in a manner not inconsistent with this opinion.
RAHMEYER, C.J., and SHRUM, J., concur.
NOTES
[1] Although we find no ruling from the trial court regarding Appellant's request for a bench trial, obviously a bench trial was held rather than a jury trial. We note that no issue has been raised regarding either the appropriateness of holding a bench trial or Appellant's or the State's right to a jury trial. Under § 632.492, RSMo 2000, the individual, the State, or the trial judge has the right to demand a jury trial. Case law has determined that the sexually violent predator statute is consistent with the law applicable to civil cases generally, specifically in terms of not allowing a party in a civil suit to waive a jury over the objection of the adverse party. State ex rel. Nixon v. Askren, 27 S.W.3d 834, 838 (Mo.App.2000). An affirmative waiver of jury trial is necessary to ensure that individuals subject to civil commitment are not involuntarily deprived of their constitutional right to trial by jury; however no constitutional right to a bench trial exists in these circumstances. Id. at 839. We assume here that Appellant affirmatively waived his right to jury trial and that the State, after given time to consider its options, did not object to the waiver.