*In re* COMMITMENT OF WILLIAM J. STEVENS, (The People of the State of Illinois, Petitioner-Appellee, v. William J. Stevens, Respondent-Appellant).

Fourth District   No. 4—01—0748

Opinion filed January 27, 2004.

Betsy Bier, of Bier & Bier, of Quincy, for appellant.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and William L. Browers and Mary Beth Burns, Assistant Attorneys General, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

In July 2001, a jury found respondent, William J. Stevens, to be a sexually violent person under the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 through 99 (West 2000)). Following an August 2001 dispositional hearing, the trial court ordered him committed to the Department of Human Services (DHS) for institutional care in a secure setting.

Respondent appeals, arguing that (1) the trial court abused its discretion by denying his motion for a *Frye* evidentiary hearing (see *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)) on the admissibility of evidence regarding actuarial instruments used by the State's experts in assessing respondent's risk of reoffending; and (2) the jury's finding was against the manifest weight of the evidence. We disagree and affirm.

## I. BACKGROUND

In January 2000, the State initiated proceedings under the Act to commit respondent to DHS indefinitely. At that time, respondent was an inmate at the Western Illinois Correctional Center and was scheduled for entry into mandatory supervised release on January 12, 2000, following the completion of his sentence on 1996 convictions for aggravated criminal sexual abuse (720 ILCS 5/12—16(d) (West 1996)) and aggravated battery (720 ILCS 5/12—4 (West 1996)).

In February 2001, respondent filed a motion for a *Frye* evidentiary hearing to determine the admissibility of evidence regarding actuarial risk-assessment instruments used by the State's experts in assessing respondent's risk of reoffending. Alternatively, respondent's motion sought to bar such evidence. Later that month, the State filed a response to respondent's motion. In March 2001, the trial court conducted a hearing on respondent's motion, and after considering counsel's arguments, the court denied the motion in all respects.

At respondent's July 2001 trial, Jacqueline Buck, a clinical psychologist and special evaluator for the Department of Corrections (DOC), testified that she had reviewed respondent's DOC master file, which contained all of the court records related to respondent, including the sentencing order, the presentence investigation reports, psychiatric and psychological evaluations, DOC records, and his criminal history.

Buck's review of respondent's master file showed that when respondent was five or six years old, his mother reported to the police that he had been sexually abused by a 16-year-old boy. He had also been abused by his sister when he was an infant. When respondent was five years old, he was found maneuvering in a sexual way on top of a four-year-old girl. Both children were clothed. When he was seven years old, respondent was found on top of a little girl, rubbing his exposed penis against her. Around that same time, respondent entered foster care and was subsequently placed in several different homes due to his having difficulty with other children.

When respondent was 12 years old, it was reported that he had sexually molested two 5-year-old boys in a foster home. Buck acknowledged that she received this information in a telephone conversation with the Adams County State's Attorney, not from any documents in respondent's master file. However, she stated she had no reason to disbelieve the report, and respondent was removed from the foster home where the incident allegedly occurred.

When respondent was 13 years old, he took a 15-year-old girl who had some "intellectual deficits" into a stairwell and "performed sexual acts." Buck found it clear from the police report that the girl did not understand what respondent was doing to her.

When respondent was 14 years old, he took a 13-year-old girl (who respondent had referred to as his "girlfriend") into the bathroom at his foster home and "made her disrobe." He also undressed and fondled the girl's breasts and attempted vaginal and anal intercourse. He then demanded that she perform oral sex on him, and he ejaculated on the bathroom wall. The girl was crying during the oral sex. As a result of this incident, respondent was adjudicated delinquent for aggravated criminal sexual abuse (720 ILCS 5/12—16 (West 1998)). Respondent was committed to DOC juvenile division.

Respondent was also charged with aggravated criminal sexual abuse of a 12-year-old boy who was mentally and physically disabled and a member of respondent's foster household. The report indicated that respondent fondled the boy's penis in a bedroom while another boy stood guard outside the door. The charge was dropped when respondent pleaded guilty to some other pending charges.

Respondent's master file also contained an April 1992 juvenile DOC disciplinary report, which stated that respondent had pressured another boy for a sexual favor and had threatened to split the boy's head open.

Buck interviewed respondent in October 1999. Based on the interview and her review of respondent's master file and other information, Buck diagnosed respondent with paraphilia not otherwise specified (paraphilia NOS), sexually attracted to nonconsenting persons (nonexclusive type). Her diagnosis was based on the evidence that beginning at age 12, respondent established a pattern of victimizing "younger people or people mentally retarded or disabled in some way."

She also diagnosed respondent with "polysubstance dependencies without physiological dependency and in a controlled environment," based on the evidence of respondent's long history of substance abuse. She further explained that substance abuse was a factor in determining respondent's probability of reoffending with additional acts of sexual violence because substance abuse contributes to a loss of ability to control sexual urges. Respondent had not participated in any substance-abuse treatment.

Buck also diagnosed respondent with antisocial personality disorder. Seven criteria exist for that diagnosis, and the presence of any three warrants the diagnosis. Respondent satisfied all seven criteria. Buck described antisocial personality disorder as "a pervasive disregard for and violation of the rights of others." The diagnosis is relevant to respondent's probability of reoffending because a person with this disorder lacks empathy or concern for other people. Buck described respondent as good at charming people to get what he wants,

and respondent described himself as being "devoid of feelings." Buck further explained that "by being cut off from his feelings he is able to inflict a lot of harm on other people and not feel any remorse or shame or sorrow for that."

Buck used "several" actuarial risk-assessment instruments to assess respondent's probability of reoffending, and she concluded that his risk was "extremely high." (The record shows that Buck administered the following instruments: (1) the Minnesota Sex Offender Screening Tool-Revised; and (2) the Violence Risk Assessment Guide.) She subsequently administered the "Sex Offender Risk Assessment Guide," on which respondent scored in the 99th percentile. This score placed respondent in the category of offenders with a 100% probability of reoffending within 7 to 10 years. Buck also administered a personality inventory (the Hare Psychopathy Checklist-Revised) in evaluating respondent.

Respondent's master file showed that he refused sex-offender treatment on three different occasions while at DOC. Respondent told Buck that he did not need treatment. He said that all he needed to do was "grow up" and he had done that. Buck acknowledged that documents in the master file indicated that respondent successfully completed a sex-offender education program and sex-offender treatment at the Illinois Youth Center in Joliet. However, in her interview with respondent, he did not admit that he had participated in treatment and would not tell Buck anything he had learned in any sex-offender program.

Buck opined that should respondent be released to the community, it was substantially probable that he would reoffend with additional acts of sexual violence due to his untreated diagnoses of paraphilia NOS, sexually attracted to nonconsenting persons (nonexclusive type), polysubstance dependency, and antisocial personality disorder.

Robin Weaver testified that on November 21, 2000, she was employed as a DHS security therapy aide. On that date, she and another staff member were transporting respondent, who was in restraints, to the Adams County courthouse. While walking respondent to the van, he became agitated and resisted getting into the van. Once he was inside the van, he laid down on his back and began kicking the interior of the van. After about 10 minutes, respondent calmed down and Weaver and her colleague entered the front compartment of the van. However, before they drove off, Weaver's colleague left the van to take a telephone call. At that point, respondent said to Weaver, in a low tone, " 'You think you are better than me, don't you. You are all high and mighty looking down on me. *** Well, bitch. You are not any better than me.' " Weaver told him to be quiet. Respondent then said,

" 'You think you are tough, don't you? *** Well, that tin badge don't make you tough, bitch. You are not tough. You are just full of cellulite.' " Respondent's last remarks to Weaver were, " 'I will throw you down and stick my pipe in you. We will see how tough you are then. We will see then how tough you are when I do this' "; and " 'Well, hell, you can't even control me with these handcuffs on. How are you going to do it when they are off?' " Weaver stated that she was terrified by respondent when he said these things.

Phil Reidda, a clinical psychologist, testified that he had been appointed by the Adams County circuit court to evaluate respondent. He reviewed respondent's DOC master file, administered psychological tests, and conducted a clinical interview, which lasted approximately 3½ hours.

Reidda administered the following tests to respondent: (1) the Gamma General Mental Ability Test, which is a cursory evaluation of intelligence; (2) the Millon Multiaxial Personality Inventory Assessment, which generates a personality profile; and (3) the Minnesota Multiphasic Personality Inventory. Respondent's score on the Gamma Test was "a little high average." The results of the Millon Assessment indicated that respondent had antisocial personality disorder, and the results of the Minnesota Multiphasic Personality Inventory underscored the conclusions of the Millon Assessment. The personality tests indicated that respondent was defiant, had conflict with authority, and had problems with his self-image. Reidda also noted that an August 1998 mental health evaluation performed by Dr. Alton Angus at the Lincoln Correctional Center indicated that respondent had an antisocial personality disorder.

Reidda stated that respondent's sexually aggressive behavior began when he was only five or six years old and that the reports "escalated" as time passed and became "stronger" as respondent matured. Reidda opined that the early onset of respondent's sexual acting out was significant because it is "one of the high risk indicators." In addition to the incidents testified to by Buck, Reidda noted that in 1996, respondent began having sexual relations with K.H., a 13-year-old girl, for which he was sentenced to DOC.

In addition to respondent's history as a sex offender, Reidda also considered that respondent had been a victim of sexual abuse during his childhood.

Reidda's review of respondent's criminal history unrelated to sexual assault showed that respondent had only once successfully completed a term of probation or parole. This was significant to Reidda because it indicated how difficult it was for respondent to "manage at the community level." In addition, respondent told Reidda that he was a gang

member. This was relevant to Reidda's evaluation because it showed that respondent identified with a group of people who hold "procriminal values" and are associated with violence.

Reidda also noted that respondent was consistently recommended for sex-offender treatment, and as an adult, he did not take advantage of any treatment opportunities. Reidda further noted that the sex-offender education program in which respondent participated while he was in DOC juvenile division did not have a significant impact on respondent. He did not participate in follow-up programs and reoffended after participating in that program.

The master file also showed that when respondent was 13 years old, his family participated in family counseling. The counselor's notes showed that respondent's sister stated that respondent had been "patting her on the butt and making sexual advances," and she was afraid of him. The counselor also noted that progress toward treatment goals was minimal because of the severity of the problems and respondent's "lack of real motivation." Reidda found this report significant because it showed (1) respondent's inability to respect boundaries; (2) his problems were "chronic"; and (3) he had never been in a situation where he was held to treatment. A report dated four months later indicated that respondent remained resistant to dealing with anything other than superficial issues and would not address family and sexual issues. The counselor thought the prognosis was very poor. Reidda opined that respondent remained at this stage.

Reidda also cited an April 1991 evaluation by Dr. Robert Thorud, when respondent was in DOC juvenile division. Thorud opined that when placed in stressful situations, respondent would "act out sexually."

Reidda further testified that the documents relating to respondent's mental health strongly supported his view of respondent's risk of reoffending because the documents consistently discuss the degree of respondent's pathology, lack of motivation, and the need for clinical intervention.

In addition, respondent's record showed that he had over 30 disciplinary infractions while at DOC. Most of respondent's disciplinary reports had to do with either rule violations or challenges to authority. This indicated to Reidda that respondent had trouble with authority and difficulty managing his behavior, even in a controlled setting. Reidda found the incident with Weaver to be particularly significant because respondent's comments to Weaver support the conclusion that respondent cannot control himself.

After respondent was released from parole in 1995, he committed criminal offenses, including possession of drug paraphernalia, criminal

trespass, fighting, possession of liquor by a minor, battery and aggravated battery, and aggravated criminal sexual abuse. According to Reidda, respondent's record was significant because it showed that his incarceration made no significant impact on him and he still had no control over his aggressive impulses.

Reidda diagnosed respondent with (1) paraphilia NOS, with a sub-diagnosis of polysubstance dependency in a controlled environment; and (2) antisocial personality disorder, severe, with narcissistic traits. Reidda described antisocial personality disorder as follows:

"In layman's terms it *** is someone who has a disregard for the other people or their property, someone who has trouble adhering to rules, and while they understand the letter of the law, they cannot seem to concern themselves about it. Generally, *** when we see antisocial personality characters, generally people think—people who are not trained—to see them as somebody without a conscience."

Reidda characterized respondent's disorder as "severe" because of its chronicity and intensity, and respondent's refusal to participate in any kind of treatment.

Reidda used two actuarial risk-assessment instruments in evaluating respondent: the Static-99 and the Minnesota Screening Tool-Revised. The results of the Static-99 placed respondent in the category of very high risk of committing future acts of sexual violence. The Minnesota Screening Tool-Revised also placed respondent in a very-high-risk category. The results of the two actuarial instruments were consistent with Reidda's clinical opinion. According to Reidda, this consistency underscored the validity of his assessment. Reidda opined that a substantial probability exists that respondent would commit future acts of sexual violence. Reidda further stated that his opinion regarding respondent's likelihood of reoffending would be the same even if he excluded from consideration the unverified report regarding the two five-year-old boys.

Terry Brelje, a licensed clinical psychologist, testified on respondent's behalf that he conducted a two-hour interview with respondent and reviewed approximately 170 pages of background material. He concluded that respondent did not meet the criteria for commitment as a sexually violent person under the Act. At the time of his interview, Brelje did not believe that respondent was experiencing any mental disorder. He ruled out antisocial personality disorder because that disorder requires that the person had a conduct disorder before 15 years of age. Brelje had reviewed a psychiatric evaluation of respondent that was conducted when he was 15 years old, and the diagnosis did not include a conduct disorder. An antisocial personality disorder

diagnosis also requires that the personality disorder be continuing into adulthood. Brelje did not believe sufficient evidence existed that respondent exhibited repetitive and continuing behavior consistent with a diagnosis of antisocial personality disorder.

Brelje further concluded that respondent did not meet the diagnosis for paraphilia. He saw no evidence of "inappropriate sexual arousal" or arousal to nonconsenting partners, and stated that "you can't use sexual behavior as a child or an adolescent to justify a diagnosis of paraphilia." The only "nonconsenting" behavior in respondent's adulthood was with K.H., a 13-year-old girl, who was nonconsenting only in that she was below the legal age of consent. Brelje acknowledged that respondent had a history of depression and substance abuse.

Brelje also acknowledged that he uses actuarial risk-assessment instruments, but he stated that it was not appropriate to use incidents which occurred before a person reached the age of 18 in applying those instruments. Brelje opined that the results of such tests are not valid when based on information from juvenile years because the tests were not designed to make assessments based on juvenile conduct. Brelje concluded that respondent did not have a substantial probability of reoffending sexually.

Carmella Stevens testified that in 1995, after dating respondent for three or four months, she and respondent married. Shortly after they married, Stevens became pregnant. At the time of respondent's trial, they were still married but had been separated since a few weeks after their nuptials. Respondent was loving toward their child, was never abusive toward Carmella, and never forced Carmella to have sex.

K.H. testified that she dated respondent when she was 13 years old. She later learned that before they started dating, respondent had been having sexual intercourse with her mother. K.H. and respondent had sexual intercourse, but respondent never tried to force her to have intercourse. She had had sexual intercourse with one person before respondent. Respondent never struck her or physically abused her and she chose to have sex with him. K.H. further testified that she fell in love with respondent when she was 13 and loved him even more now. She would do anything to help him.

Based on the evidence presented, the jury found that respondent was a sexually violent person. The trial court later ordered him committed to DHS for institutional care in a secure setting. This appeal followed.

## II. ANALYSIS

### A. The Trial Court's Denial of Respondent's Motion for a *Frye* Hearing

Respondent first argues that the trial court erred by denying his motion for a *Frye* evidentiary hearing to determine whether to admit evidence regarding actuarial instruments used by Buck and Reidda in assessing respondent's risk of reoffending. We disagree.

### 1. *Applicability of the Frye Standard to Actuarial Risk-Assessment Instruments*

#### a. Scientific Principle, Method, or Test

■ In *In re Detention of Erbe*, 344 Ill. App. 3d 350, 364, 800 N.E.2d 137, 149 (2003), this court recently held that actuarial risk-assessment instruments of the sort used in this case—namely, the Minnesota Screening Tool-Revised, the Static-99, and the Violence Risk Assessment Guide—do not purport to involve a scientific principle, method, or test to which *Frye* applies. In so holding, we stated, in pertinent part, as follows:

> "Actuarial risk-assessment instruments, like those used in this case, were developed by observing those sex offenders who reoffend to determine which 'risk factors' they have in common. See *In re Detention of Isbell*, 333 Ill. App. 3d 906, 911, 916, 777 N.E.2d 994, 997-98, 1002 (2002) (by observing what a large number of reoffenders have had in common, one can compile a list of risk factors). One can then calculate the relative frequency with which sex offenders with those risk factors have reoffended and thus assess the probability that other sex offenders with the same risk factors will reoffend. *Isbell*, 333 Ill. App. 3d at 916, 777 N.E.2d at 1002. The actuarial instruments merely help the professional draw inferences from historical data or the collective experience of other professionals who have assessed sex offenders for risks of reoffending. In this regard, the instruments are akin to actuarial tables for life expectancy admitted as evidence to a jury for the determination of the gross amount awarded for future pain and suffering or used by an economic expert to determine the present cash value of a pension. Such instruments simply do not constitute a special scientific principle, method, or test to which *Frye* applies." *Erbe*, 344 Ill. App. 3d at 364-65, 800 N.E.2d at 149.

We adhere to our holding in *Erbe* and thus reject respondent's contention that *Frye* applies in this case.

#### b. Novelty

Even assuming that the sort of actuarial instruments used by

Buck and Reidda involve a scientific principle, method, or test, those instruments do not involve the kind of "new" or "novel" scientific principle, method, or technique to which *Frye* applies. *Erbe*, 344 Ill. App. 3d at 365, 800 N.E.2d at 150. As we stated in *Erbe*, 344 Ill. App. 3d at 366, 800 N.E.2d at 150, "Our society uses actuarial methods to predict human behavior all the time (for example, in liability insurance and economics). In addition, actuarial instruments similar to the ones used in this case have long been used in predicting recidivism by released prisoners."

### 2. General Acceptance of Actuarial Risk-Assessment Instruments

■ Even assuming that the *Frye* standard applies, we agree with the trial court that the use of actuarial risk-assessment instruments is generally accepted by professionals who assess sex offenders for risk of reoffending.

In *Erbe*, 344 Ill. App. 3d at 369, 800 N.E.2d at 153, this court held that "the use of actuarial risk-assessment instruments is sufficiently established to have gained general acceptance by professionals who assess sex offenders for risks of reoffending." In so holding, we thoroughly examined every reported decision in the United States that addressed the admissibility of evidence regarding actuarial risk-assessment instruments in a sexually-violent-persons proceeding and found the decisions allowing evidence regarding such instruments to be more persuasive (see for example *In re Commitment of R.S.*, 339 N.J. Super. 507, 540-41, 773 A.2d 72, 92 (2001), *aff'd*, 173 N.J. 134, 801 A.2d 219 (2002) (in which the New Jersey appellate court held that the use of actuarial instruments was generally accepted by professionals who assess sex offenders for risks of reoffending); *In re Detention of Strauss*, 106 Wash. App. 1, 8, 20 P.3d 1022, 1025 (2001) (in which the Washington appellate court held that actuarial instruments were generally accepted within the relevant scientific community)). *Erbe*, 344 Ill. App. 3d at 369-70, 800 N.E.2d at 152. We adhere to our holding in *Erbe* and thus conclude that the trial court did not err by denying respondent's motion for a *Frye* hearing.

### 3. Harmless Error

Even accepting respondent's contention that the trial court erred by failing to conduct a *Frye* hearing, we conclude that any error was harmless because the evidence presented at respondent's trial established that the actuarial risk-assessment instruments at issue are generally accepted by professionals who assess sex offenders for risks of reoffending. In particular, Reidda testified that such actuarial instruments are generally accepted and are the "best tools" that professionals have to assess sex offenders' risks of reoffending. Indeed,

Brelje acknowledged that a "large percentage" of professionals who evaluate sex offenders, including Brelje himself, use actuarial instruments in assessing the risks of reoffending. He also acknowledged that (1) actuarial instruments "add to the overall batch of stuff that [professionals] look at" in assessing the risks of reoffending; and (2) risk-assessment predictions that are based on actuarial instruments are "slightly more" accurate than predictions that are based solely on a clinician's professional judgment. Brelje further acknowledged that the actuarial instruments utilized by Buck and Reidda were appropriate to administer to respondent based on his adult behavior.

As a final matter, we note that traditional methods, such as cross-examination and rebuttal witnesses, offered respondent the opportunity to challenge Buck's and Reidda's opinions in the proper forum—that is, during trial in front of the jury. As the Supreme Court stated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596, 125 L. Ed. 2d 469, 484, 113 S. Ct. 2786, 2798 (1993), "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." See also *Halleck v. Coastal Building Maintenance Co.*, 269 Ill. App. 3d 887, 897, 647 N.E.2d 618, 627 (1995) (on cross-examination, counsel may probe the weaknesses in the bases of an expert's opinion as well as the general soundness of his opinion).

The record shows that respondent conducted a vigorous cross-examination of Buck and Reidda. In addition, Brelje testified regarding the predictive value of actuarial risk-assessment instruments, how professionals may misuse actuarial instruments, and when it is appropriate to use such instruments to assess the risks of reoffending.

### B. Sufficiency of the Evidence

Last, respondent argues that the jury's finding that he was a sexually violent person was contrary to the manifest weight of the evidence. Specifically, he contends that the evidence was insufficient because (1) the State failed to prove that he lacked the ability to control his sexually dangerous behavior; (2) the evidence did not support Buck's and Reidda's diagnoses of paraphilia; and (3) the evidence did not establish a connection between his mental disorder and his probability of reoffending. We disagree.

Section 5(f) of the Act defines a sexually violent person as an individual who has "been convicted of a sexually violent offense, *** and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in

acts of sexual violence." 725 ILCS 207/5(f) (West 2000). The State must prove the allegations of its petition beyond a reasonable doubt. 725 ILCS 207/35(d)(1) (West 2000). On review, we ask only whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could find the elements proved beyond a reasonable doubt. *In re Detention of Tittlebach*, 324 Ill. App. 3d 6, 11, 754 N.E.2d 484, 488 (2001).

1. *Proof of Respondent's Difficulty Controlling His Behavior*

■ Respondent contends that (1) *Kansas v. Crane*, 534 U.S. 407, 151 L. Ed. 2d 856, 122 S. Ct. 867 (2002), requires a separate lack-of-control determination couched in terms of "serious difficulty in controlling his dangerous behavior"; and (2) the State failed to prove this element. We disagree.

In *Crane*, the United States Supreme Court interpreted Kansas's Sexually Violent Predator Act (Kan. Stat. Ann. § 59—29a01 *et seq.* (1994)), the same act it held constitutional in *Kansas v. Hendricks*, 521 U.S. 346, 138 L. Ed. 2d 501, 117 S. Ct. 2072 (1997). The *Crane* Court reversed the Kansas Supreme Court's holding that pursuant to *Hendricks*, the State must prove that the respondent had a total or complete lack of control over his dangerous behavior. Specifically, the Court held that the Kansas Supreme Court's decision was based on an overly restrictive interpretation of *Hendricks*. *Crane*, 534 U.S. at 411-12, 151 L. Ed. 2d at 861-62, 122 S. Ct. at 870. Although evidence of a complete lack of control is not required, a commitment would not be constitutional if no volitional impairment showing were made. *Crane*, 534 U.S. at 412, 151 L. Ed. 2d at 862, 122 S. Ct. at 870.

We first note that the Act contains a volitional component in (1) its definition of "mental disorder" as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence" (725 ILCS 207/5(b) (West 2000)); and (2) its required finding that it is "substantially probable" that the respondent will engage in proscribed sexual conduct in the future. *People v. Masterson*, 207 Ill. 2d 305, 319, 798 N.E.2d 735, 743 (2003). In *In re Detention of Varner*, 207 Ill. 2d 425, 432 (2003), our supreme court held that *Crane* "did not hold that the [c]onstitution requires a specific determination by the fact finder in every case that a person lacks volitional control." The court further concluded that the Act "contain[s] definitions that supply the constitutionally required elements for civil commitment," and "[a] fact finder properly instructed with definitions of these and other pertinent statutory terms need not receive additional separate instruction on lack of control." *Varner*, 207 Ill. 2d at 432-33.

Respondent asserts that the State's evidence of his lack of volitional control consisted of Buck's and Reidda's diagnoses of paraphilia, coupled with their assessments of his risk of reoffending based on the actuarial instruments. However, the record shows that Buck and Reidda testified that respondent's inability to control his dangerous conduct resulted from (1) his antisocial personality disorder; (2) his substance abuse; and (3) his failure to get treatment for his paraphilia and other mental disorders. Respondent's inability to control his dangerous behavior was further evinced by Weaver's testimony regarding respondent's conduct toward her. We conclude that this evidence sufficiently supports the jury's finding that respondent lacked volitional control over his dangerous conduct beyond a reasonable doubt.

## 2. *Sufficiency of the Evidence To Support a Diagnosis of Paraphilia*

■ Respondent next contends that the evidence does not support Buck's and Reidda's diagnoses of paraphilia because (1) paraphilia requires that the person be at least 16 years old; and (2) respondent committed only one offense after the age of 16. We disagree.

In this case, the evidence showed that at the age of 19, respondent was involved in a five-month sexual relationship with K.H., a 13-year-old girl. The fact that respondent was convicted of only one crime related to that conduct does not bar Buck from considering, for the purpose of psychological diagnosis, that respondent had repeatedly engaged in sexual acts with K.H., a girl too young to provide meaningful consent.

## 3. *Sufficiency of the Evidence Regarding Respondent's Engaging in Future Acts of Sexual Violence*

■ Last, respondent contends that the evidence did not show that because of his mental disorder a substantial probability existed that he would engage in future acts of sexual violence. We disagree.

Contrary to respondent's assertion that "there was no testimony in which the experts linked their conclusion that [respondent] was substantially probable to commit future acts of sexual violence with a mental disorder," the record shows that the State's witnesses did just that. Both Buck and Reidda testified that respondent's mental disorders, including his paraphilia, antisocial personality disorder, and substance dependency, caused him to be more likely to reoffend. We conclude that their testimony sufficiently supports the jury's finding that respondent's mental disorders make it substantially probable that he would engage in future acts of sexual violence.

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

TURNER and McCULLOUGH, JJ., concur.