In the Matter of the CARE AND TREATMENT OF Kenneth K. BURGESS, Respondent–Appellant.

No. 25768.

Missouri Court of Appeals,
Southern District,
Division One.

Sept. 23, 2004.

Petition for Rehearing and Transfer
Denied Oct. 15, 2004.

Application for Transfer Denied
Nov. 23, 2004.

Emmett D. Queener, Columbia, for Appellant.

Jeremiah W. Nixon, Attorney General, Ronald Molteni, Assistant Attorney General, Jefferson City, for State.

PREWITT, Judge.

The State of Missouri petitioned the Probate Division of the Circuit Court of Greene County ("trial court"), seeking to confine Kenneth K. Burgess ("Appellant") as a sexually violent predator. Following jury trial, Appellant was adjudicated a sexually violent predator pursuant to § 632.480, RSMo 2000, and ordered "committed to the custody of the director of the Department of Mental Health for control, care and treatment until such time as [Appellant's] mental abnormality has so changed that he is safe to be at large."

The commitment followed Appellant's confinement for forcible rape, in violation of § 566.030, RSMo 1986, and sodomy, in violation of § 566.060, RSMo 1986. In 1990, Appellant entered Alford pleas of guilt to the charges (*see North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970)), and was sentenced to two concurrent seven year prison terms.

Appellant raises two points in this appeal. First, he contends that the trial court erred in ordering his commitment because there was insufficient evidence to prove beyond a reasonable doubt that he had a mental abnormality as defined by § 632.480, RSMo 2000. Second, Appellant contends that the trial court abused its discretion by failing to declare a mistrial because the State stated in closing argument that Appellant refused to be interviewed by an expert thus preventing that expert from making a diagnosis of a particular mental abnormality, which Appellant contends allowed the jurors to infer the presence of that mental abnormality.

## Background

In 1981, Theresa Blinzler met Appellant at a bar or tavern. Appellant indicated he needed a ride to his sister's house, and Blinzler and a friend of hers gave him a ride to a house. While the friend stayed outside, Blinzler accompanied Appellant into the house, after which he locked the door and "had a sudden change in demeanor[.]" Appellant then "ripped [Blinzler's] clothing off ..., got her onto a bed, and forced himself on her, had intercourse with her." Charges were filed in the case, but Appellant was not convicted of any criminal offense.

In September of 1986, Rebecca Simpson worked at K Highway Liquor in Aurora, Missouri. On September 24, 1986, Appellant entered the store and purchased cigarettes and a bottle of wine. Appellant was known to Simpson, as he was in the store nearly every day, sometimes more than once a day.

On the morning of September 24, 1996, Simpson could tell that Appellant had been drinking. Simpson noticed that Appellant was becoming angrier, apparently because his wife was pregnant and possibly seeing another man. Simpson was not initially concerned about Appellant's behavior, but as his demeanor became more belligerent, Simpson thought he might rob the store. Simpson tried to walk toward the phone, but Appellant asked her to sit down and listen to him.

At some point, Appellant took off his belt, started dancing, and then placed the belt around Simpson's neck. He unzipped his pants and forced his penis into Simpson's mouth. A customer entered the store and noticed Simpson crying and left to get the store's owner. Appellant was still in the store when the owner arrived, but Appellant's manner changed and Appellant indicated that everything was fine and left. Simpson told the owner about Appellant placing the belt around her neck and the owner called the police.

Simpson was hesitant to tell anyone what happened, but after Appellant returned to the store a couple of days later and confronted Simpson in a grocery store, she told her husband at least some of the details. Simpson ultimately told her husband and the store's owner the complete details. Approximately two weeks after the incident, Simpson gave a statement to the police. Charges were filed and a trial held, but Appellant was acquitted.

The conduct that provided the basis for the Alford pleas occurred in April 1987. On April 12, 1987, Georgianne James, after completing her shift and going home to clean up, returned to the Battlefield Lanes to practice bowling. Her brother gave her a ride there. James met Appellant when she went to the bar to get a drink. They struck up a conversation and Appellant indicated he was in town to visit his sister

and wanted to find a place to cash a check. James indicated Appellant could cash a check at a grocery store down the street, and she offered to go with him and show him where the store was located. They left together in Appellant's car, and Appellant was driving.

Appellant, however, drove past the grocery store and told James he was going to his sister's house instead to get some money. Appellant turned down a street that was very dark and at some point James saw a mobile home, which Appellant indicated belonged to his sister, and two vehicles. Rather than stop at the home, Appellant turned his vehicle around and noted that his sister had company, and he did not want to bother her.

Appellant kept driving, west on Highway M, until "[t]here weren't hardly any houses and it was just like fields, and trees, and then he kept going." Appellant eventually stopped the car, and proceeded to rape and sodomize James. James was able to get the license plate number of Appellant's car, and she also managed to hide in a ditch and get away from Appellant as he drove off. James went to a house and from there the Sheriff's Office was contacted.

Charges were subsequently filed against Appellant, and he was convicted following a jury trial. The convictions were later reversed, however, and the cause remanded, after which Appellant entered Alford pleas to the forcible rape and sodomy counts. Appellant was sentenced to two concurrent seven-year terms of imprisonment.

In addition to the other charges indicated above, Appellant's pre-sentence investigation showed records of arrest for second degree assault, vehicular injury, felonious restraint, and more than one DWI (driving while intoxicated) charge. While serving

his two concurrent seven-year sentences, Appellant was convicted of delivery/possession of drugs on a correctional facility and received a two-year sentence, to be served consecutive to his previous sentences.

In March 1997, Appellant was released on parole and placed under community supervision. Two conditions of his parole were that he "enter and successfully complete" both an outpatient substance abuse program and an outpatient sex offender program. He never met either of those two conditions.

While out on parole, Appellant was arrested twice for DWI, once in Aril 1997, and the second time in July 1997. Following the second DWI arrest, Appellant was ordered to a residential treatment center, but he did not complete that substance abuse program. On October 23, 1997, Appellant was arrested for disorderly conduct. He was staggering in the street and "clearly intoxicated to the arresting officer." In November 1997, based on the non-completion of the residential treatment program, Appellant was placed in an institutional treatment center in Farmington, but refused to participate in the program, which led to his return to incarceration at Farmington's Division of Adult Institutions.

Over the course of his incarceration, including following his return in December 1997, Appellant received a total of six conduct violations, the first of which occurred after he was found with a bag of marijuana in his shoe, which resulted in his conviction for delivery/possession of drugs on a correctional facility. His most recent conduct violation, written on December 11, 1997, was based on his refusal to participate in the Farmington Treatment Center drug and alcohol program. This was despite "long-term self-reported alcohol dependence problems."

Regarding the Missouri Sexual Offender Program (MOSOP), Appellant was sent a notice in April 1994 to attend MOSOP Phase I, but he signed a refusal-to-participate form. Appellant indicated to staff of the program that he had no intention of participating in the program. He was sent another notice to attend Phase I of the program on January 19, 1996, but he did not attend the scheduled session. Appellant was sent a third notice in March 1996, but he signed a refusal-to-participate form. On November 3, 1998, Appellant indicated "his choice to not request another chance to complete MOSOP." Because of his refusal to participate in the program, Appellant was never interviewed by a MOSOP therapist.

Prior to Appellant's anticipated release date, March 3, 1999, Gerald Hoeflin, an associate psychologist at Farmington Correctional Center, completed an end-of-confinement report. In February 1999, Appellant completed a set of psychological tests and participated in a clinical interview with Hoeflin. During the interview, Appellant denied any deviant sexual history and described "a history that was very unremarkable." Appellant appeared annoyed throughout the interview, indicating that he had served his sentence for the crimes and would not be in this situation had two years not been added to his sentence for the conviction on drug charges while incarcerated.

Appellant completed three psychological tests, the Multiphasic Sexual Inventory (MSI), the Minnesota Multiphasic Inventory (MMPI–2), and the Million Clinical Multiphasic Inventory (MCMI–II). The results of the MMPI–2 and the MCMI–II were considered unusable because of the large number of questions Appellant left unanswered. The MSI results showed a pattern of a denial of sex desires and interests. The score on a validity scale

indicated that Appellant "was likely dishonest about his interest in sex deviance."

The report outlined Appellant's history of alcohol dependency, with Hoeflin noting that Appellant's "alcohol consumption shows a great deal of impulsivity in his life pattern." According to Hoeflin, in all of Appellant's sexually-related arrests, he used deceitfulness and intimidation, showed a radical change in his demeanor, and was intoxicated. Those facts and patterns, along with Appellant's refusal to participate in sex offender programs or show remorse for his crimes, provided "evidence to the mental abnormality of Antisocial Personality Disorder[.]" In addition, Appellant's crime against an adult met the necessary criteria for a diagnosis of sexual abuse of an adult.

The summary of Hoeflin's end-of-confinement report listed three diagnoses: sexual abuse of an adult, alcohol dependence, and antisocial personality disorder. The report concluded that "[b]ased on [Appellant's] previous arrest record, the violent nature of his current crime of Forcible Rape and Sodomy, the evidence of a mental abnormality, and the fact that he committed his crime against a virtual stranger, all make it more likely than not that [Appellant] will engage in predatory acts of sexual violence if not confined in a secured facility."

Pursuant to § 632.483.4, RSMo 2000, a multidisciplinary team reviewed the records to assess whether Appellant met the statutory definition of a sexually violent predator. By a vote of four to one, the team determined that Appellant "did not appear to meet the definition." Following that determination, a prosecutor's review committee, which was appointed pursuant to § 632.483.5, RSMo 2000, voted and determined by a majority vote that Appellant met the statutory definition of a sexually violent predator.

On March 2, 1999, the State filed a petition requesting that proceedings be held to find whether Appellant was a sexually violent predator and that, if he was so found beyond a reasonable doubt, that he "be committed to the custody of the Department of Mental Health in a secure facility for control, care and treatment until such time as his mental abnormality has so changed that he is safe to be at large[.]" An amended petition was filed on March 4, 1999. The amended petition indicated that there was sufficient evidence that Appellant suffers from a mental abnormality, specifically antisocial personality disorder, that "makes him more likely than not to engage in predatory acts of sexual violence if released[.]"

Dr. Bruce Harry, a staff psychiatrist for the Department of Mental Health practicing at the Fulton State Hospital, was ordered by the court to evaluate Appellant and determine whether Appellant suffers from a mental abnormality and, if so, whether that mental abnormality makes it more likely than not that Appellant will engage in predatory acts of sexual violence if not confined to a secure facility.

Dr. Harry reviewed the available records and conducted a three-minute interview and examination of Appellant. The length of the interview and examination was only three minutes because, on advice of counsel, Appellant refused to participate in the process. According to Appellant, "he [had] given statements in the past and did not want current or future statements to be used against him." Appellant informed Dr. Harry that "he was angry about being at the Sexually Violent Predator Treatment Program at Farmington Correctional Center because he had already completed his sentence for something that the 'alleged victim' asserted."

Dr. Harry used all of the available information on Appellant to calculate scores on the following actuarial inventories: Minnesota Sex Offender Screening Tool (MSOST), Minnesota Sex Offender Screening Tool–Revised (MSOSTR), and the Rapid Risk Assessment for Sex Offense Recidivism (RRASOR). Appellant received a score of 46 on the MSOST, and a two on both the MSOSTR and the RRASOR. According to Dr. Harry, these scores indicated that Appellant had a 33.7% chance of being arrested for another sexual offense over the next fives years (under the MSOST) and a 14.2% to 21.1% recidivism rate over the next five to ten years under the RRASOR.

Dr. Harry listed four diagnoses: alcohol dependence, antisocial personality disorder, adult antisocial behavior, and "rule-out" paraphilia not otherwise specified. To answer the question whether Appellant suffers from a mental abnormality, Dr. Harry indicated that, to a reasonable degree of medical certainty, Appellant's alcohol dependence was a mental abnormality, in that it "is a congenital or acquired condition [a]ffecting the emotional or [volitional] capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others."

With regard to the diagnoses of antisocial personality disorder and adult antisocial behavior, Dr. Harry noted there was a history and pattern of such behavior and of the antisocial personality diagnosis, but that because of Appellant's refusal to submit to an examination, Dr. Harry was unable "to independently confirm the diagnos[e]s." Dr. Harry stated that if Appellant suffered from antisocial personality disorder, that too would be a mental abnormality.

Dr. Harry also determined that Appellant exhibited characteristics of paraphilia not otherwise specified. That diagnosis, according to Dr. Harry, was consistent with Appellant's denial of any sexual problems, denial of the extent of his sexual encounter with James, and his refusal to participate in MOSOP. Dr. Harry's indication of "rule out" paraphilia not otherwise specified meant that that the records showed behaviors consistent with a paraphilic disorder. Dr. Harry testified that paraphilic disorders were "intense sexual urges to have sex with non-consenting partners[.]"

Essentially, according to Dr. Harry, there was a suggestion there, but he "couldn't prove it one way or another[.]" To so prove whether or not Appellant suffered from paraphilia, Dr. Harry testified it was necessary for him "[t]o have a candid, full, open and honest interview with [Appellant]." However, according to Dr. Harry, Appellant's history showed a "need to control, dominate, manipulate, take advantage of [a] non-consenting partner," all of which were signs indicative of paraphilia. Dr. Harry noted, including on cross-examination by Appellant's counsel, that he was unable to say to a reasonable degree of medical certainty that Appellants suffers from paraphilia. However, Dr. Harry also stated, "Well, [Appellant's] still getting the thoughts, the ideas, fantasies, urges, impulses … from somewhere. Maybe it's not a paraphilia, maybe it's another source. But then the alcohol is that problem. He can't stop or won't stop[.]" If a diagnosis of paraphilia was determinable, Dr. Harry noted that it would also be a mental abnormality.

Dr. Harry's report concluded as detailed below and he answered whether, if Appellant suffers from a mental abnormality, whether that mental abnormality made it more likely than not that Appellant would engage in predatory acts of sexual violence if not confined to a secure facility.

Based upon only the actuarial[ ] measures, [Appellant] has a less than 50% chance of recidivism over five to ten years if not confined in a secure facility. However, given his refusal to accept treatment for his Alcohol Dependence, his refusal to participate in the Missouri Sex Offender Treatment Program, his refusal to admit to responsibility for the present offense, his denial of having any sexual problems while interviewed in the Department of Corrections, and his refusal to submit to examination, I conclude to a reasonable degree of medical certainty that [Appellant] is more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility. His first Rape charge occurred in 1981. Although that charge was dismissed, it involved allegations of a sexual assault while he was intoxicated upon a female victim with whom he had been drinking at a bar. The next alleged sexual assault occurred on 9–24–86 when [Appellant] sexually assaulted a woman in a package liquor store after he had gone to the store to purchase liquor about an hour earlier, left, then returned, ordering more wine and drinking. Finally the present (1987) offense involved him sexually assaulting a woman with whom he had been drinking at a bar. This indicates a pattern of [Appellant] sexually assaulting women with whom he had apparently promoted a relationship for the purpose of drinking, and sometimes sharing his marital problems. This further suggests that this pattern represents a ruse to take these women into his confidence. He has not been documented to have engaged in sexual violence while under confinement. Therefore, I conclude to a reasonable degree of medical certainty that [Appellant] suffers from a mental abnormality that makes him more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility.

As indicated above, Dr. Harry testified on behalf of the State at Appellant's jury trial. Simpson, Appellant's alleged victim at the liquor store, also testified. Appellant called two members of the multidisciplinary team as witnesses, and Appellant himself did not testify. The State did ask the court, outside of the presence of the jury, for allowance to call Appellant as a witness for its case in chief, but the trial court ruled that it would not permit the State to call Appellant as a witness.

After the jury returned its verdict finding that Appellant was a sexually violent predator, the trial court entered it order committing Appellant "to the custody of the director of the Department of Mental Health for control, care and treatment until such time as [Appellant's] mental abnormality has so changed that he is safe to be at large." Appellant's motion for new trial was denied and this appeal followed.

## Discussion

Appellant raises two points in his appeal. Additional facts necessary to the disposition of the case are included below as we address each of the points.

*Point I—Sufficiency of evidence*

In his first point, Appellant contends that the trial court erred in committing him to the custody of the Department of Mental Health because the evidence was insufficient to prove, beyond a reasonable doubt, that he has a mental abnormality under § 632.480, RSMo 2000. Appellant concedes that the evidence demonstrated he suffers from alcohol dependency, but Appellant argues that alcohol dependence "is too imprecise a category to establish the presence of a congenital or acquired condition affecting the emotional or volitional capacity predisposing [Appellant] to commit sexually violent offenses."

Appellant's argument alludes to the definition of mental abnormality, which is detailed in § 632.480, RSMo, which defines mental abnormality as "a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others." § 632.480(2), RSMo 2000. The Missouri Supreme Court has indicated mental abnormality is "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to commit sexually violent offenses in a degree that causes the individual serious difficulty in controlling his behavior." *In re Care and Treatment of Thomas,* 74 S.W.3d 789, 792 (Mo.banc 2002).

Under § 632.480(5), RSMo 2000, a sexually violent predator is

any person who suffers from a mental abnormality which makes the person more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility and who:

(a) Has pled guilty or found guilty, or been found not guilty by reason of mental disease or defect pursuant to section 552.030, RSMo, of a sexually violent offense; or

(b) Has been committed as a criminal sexual psychopath pursuant to section 632.475 and statutes in effect before August 13, 1980.

Predatory acts are "acts directed toward individuals, including family members, for the primary purpose of victimization[.]" § 632.480(3), RSMo 2000.

■ When reviewing the sufficiency of the evidence, we must determine whether the evidence was sufficient for a reasonable juror to have believed beyond a reasonable doubt that Appellant was a sexually violent predator (SVP). *In re Care and Treatment of Amonette,* 98 S.W.3d 593, 600 (Mo.App.2003). The evidence is viewed in the light most favorable to the jury verdict and we disregard all contrary evidence and inferences. *In re Care and Treatment of Cokes,* 107 S.W.3d 317, 321 (Mo.App.2003).

■ It is the State's burden to prove beyond a reasonable doubt that Appellant meets the statutory definition of a SVP. *In re Care and Treatment of Coffel,* 117 S.W.3d 116, 121 (Mo.App.2003). However, in reviewing the evidence, this Court will not give the State the benefit on any unreasonable, speculative, or forced inferences; nor will we supply any missing evidence. *Cokes,* 107 S.W.3d at 321.

Appellant only disputes the sufficiency of the evidence as it relates to mental abnormality. He does not dispute the evidence regarding any other portion of the statutory definition of SVP. A breakdown of the definition of mental abnormality was accomplished by our colleagues in the Eastern District and we find their analysis helpful here. *See In re Care and Treatment of Pate,* 137 S.W.3d 492, 497–98 (Mo. App.2004).

■ To be a mental abnormality, alcohol dependence must first be a congenital or acquired condition. *See id.* at 497; *Thomas,* 74 S.W.3d at 792; § 632.480(2), RSMo 2000. According to Dr. Harry's report, Appellant's father was an alcoholic and Appellant began drinking when he was fourteen, and drank two cases of beer every day between the ages of eighteen and twenty-three. Appellant was divorced from his first wife due to his excessive alcohol consumption. We find these facts are enough to show alcohol dependency is a congenital or acquired condition.

Under the second part of the definition of mental abnormality, alcohol dependence must affect "the emotional or volitional

capacity that predisposes the person to commit sexually violent offenses that causes the individual serious difficulty in controlling his behavior." *Thomas,* 74 S.W.3d at 792. Dr Harry testified, "Well, he's still getting the thoughts, the ideas, fantasies, urges, impulses ... from somewhere. Maybe it's not a paraphilia, maybe it's another source. But then the alcohol is that problem. He can't stop or won't stop[.]"

Based on our own research, we tend to agree with Appellant that there is no reported case from any jurisdiction in which alcohol dependency or any condition related to substance abuse has been "the" mental abnormality that led to a finding that a person was a SVP. Substance abuse has been a noted factor, however, in several cases. *See, e.g., Pate,* 137 S.W.3d at 498; *In re Care and Treatment of Collins,* 140 S.W.3d 121, 125-26 (Mo.App.2004); *People v. Butler,* 68 Cal.App.4th 421, 442, 80 Cal. Rptr.2d 357 (1998); *In re Detention of Erbe,* 344 Ill.App.3d 350, 279 Ill.Dec. 295, 800 N.E.2d 137, 143 (2003); *In re Commitment of Stevens,* 345 Ill.App.3d 1050, 281 Ill.Dec. 415, 803 N.E.2d 1036, 1039 (2004).

In *Coffel,* a Missouri case, alcohol abuse was listed among the diagnoses by an expert, but that expert specifically noted that the substance abuse disorder did not "qualify as a mental abnormality within the meaning of the statute because [it does not] create[ ] a predisposition to sexually violent behavior." 117 S.W.3d at 120.

In *Collins,* a recent Missouri case, testimony from an expert indicated that the appellant suffered from pedophilia and alcoholism, but that neither predisposed him to commit sexually violent offenses. 140 S.W.3d at 125-26. That same expert also noted that he was concerned that the appellant was more likely to re-offend when he had been drinking, but that, unlike Appellant here, the appellant had completed alcohol treatment. *Id.* at 125.

In *Pate,* also a Missouri case, the appellant was diagnosed with a personality disorder, and in determining that it was a mental abnormality, the expert "referenced [the appellant's] frequent arrests for sexual and nonsexual offenses, and his ongoing substance abuse problems." 137 S.W.3d at 498.

In *Butler,* a California case, the court found it sufficient that the state showed "that defendant suffered from paraphilia and that his alcoholism caused him to lose control, become dangerous to others, and become predisposed to act on his paraphilic interests." 68 Cal.App.4th at 442, 80 Cal.Rptr.2d 357.

In *Erbe,* a case decided by an Illinois appellate court, the trial court's judgment that the respondent was a sexually violent predator was affirmed. 800 N.E.2d at 140 and 157. Among the diagnoses of the expert was "poly drug dependence," based on a long history of substance abuse. *Id.* at 143. The expert testified that the substance abuse was a factor in the determination of the respondent's likelihood of reoffending. *Id.*

In another Illinois case, the jury's verdict was affirmed. *Stevens,* 281 Ill.Dec. 415, 803 N.E.2d at 1038 and 1047. Among the testimony was a state's expert who diagnosed the respondent with "paraphilia NOS [not otherwise specified], with a subdiagnosis of polysubstance dependency in a controlled environment[.]" *Id.* at 1042. The respondent's expert concluded the respondent did not meet the diagnosis of paraphilia, but that expert did acknowledge the respondent's history of substance abuse. *Id.* at 1043.

In Missouri, part of our consideration is whether a relationship exists between a particular disorder and the sexual offenses

committed by the alleged sexually violent predator. *See Coffel,* 117 S.W.3d at 121. This has been articulated in other jurisdictions as well, in California for example, where the factors that cause a person to "lose control" or be predisposed to the commission of sexual offenses are considered. *See Butler,* 68 Cal.App.4th at 442, 80 Cal.Rptr.2d 357.

Within the case at bar, acknowledging that Hoeflin, as an associate psychologist, was not qualified to render any diagnoses, *see In re Johnson,* 58 S.W.3d 496, 499 (Mo.banc 2001), Dr. Harry's testimony was that Appellant suffered from alcohol dependence, which Dr. Harry determined was a mental abnormality. Even though Hoeflin may not be qualified to diagnose, an expert such as Dr. Harry may be permitted to rely on such information as long as the information is not offered as independent substantive evidence and serves only as background for the expert's opinion. *Grab ex rel. Grab v. Dillon,* 103 S.W.3d 228, 239 (Mo.App.2003).

Given the circumstances of this case, we agree that Appellant's alcohol dependence met the definition of a mental abnormality used in Missouri and as stated in *Thomas*—"a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to commit sexually violent offenses in a degree that causes the individual serious difficulty in controlling his behavior." 74 S.W.3d at 792.

We find that the evidence was sufficient for a reasonable jury to have believed and found beyond a reasonable doubt that Appellant suffers from a mental abnormality and is a SVP. *See Amonette,* 98 S.W.3d at 600. Point I is denied.

*Point II—Effect of Appellant's refusal to be interviewed*

■ In his second point, Appellant contends that the trial court abused its discretion by failing to declare a mistrial after the State argued in closing that Appellant's refusal to be interviewed by Dr. Harry prevented Dr. Harry from diagnosing Appellant with paraphilia. According to Appellant, this violated his constitutional rights because the State's argument invited the jurors to hold Appellant's refusal to be interviewed against him and to infer the presence of paraphilia.

During the trial, Appellant objected to any reference in Dr. Harry's testimony regarding paraphilia, and went further by "asking for a mistrial if [Dr. Harry was] allowed to go into the area of paraphilia[.]" The trial court overruled Appellant's objection and indicated it would reserve its ruling on the mistrial, allowing Dr. Harry's testimony to continue.

During the State's closing argument, it made the following statements:

[Appellant's] entire defense on this case is that he has not been diagnosed with a psychological diagnosis. This doesn't require a psychological diagnosis of paraphilia. All it requires is a psychological problem.

And what did Dr. Harry say? [Appellant] has psychological problems. He rapes women. That's a problem. Dr. Harry doesn't have to find a psychological diagnosis, and why couldn't he diagnose definitively? He said it was a provisional diagnosis, or a rule out.

Why couldn't he diagnose paraph[i]lia? Because he didn't get the opportunity to talk to [Appellant]. Easy to avoid being diagnosed.

Appellant's counsel indicated he was "going to move again for a mistrial[,]" noting that the State's statements "clearly violate[ ] [Appellant's] right to remain silent." The court denied Appellant's request for a mistrial.

■ We review a trial court's ruling during closing argument for abuse of discretion. *Warren Davis Properties V,*

*L.L.C. v. United Fire & Cas. Co.,* 111 S.W.3d 515, 527 (Mo.App.2003). Counsel are afforded wide latitude in closing argument in arguing facts and drawing inferences from the evidence. *Id.*

Regarding a mistrial, it is a drastic remedy that should only be granted if the alleged incident is so grievous that any prejudicial effect can be removed in no other way. *Id.* The trial court is in a far superior position to assess the impact of an argument on a jury. *Leo Journagan Constr. Co., Inc. v. City Utilities of Springfield, Mo.,* 116 S.W.3d 711, 722 (Mo. App.2003). Assessing whether any prejudicial effect occurred is in the discretion of the trial court, and only if the trial court's decision was clearly against reason and resulted in prejudice will we find that the trial court abused its discretion. *Warren Davis,* 111 S.W.3d at 527. Where a party fails to ask for a limiting or curative instruction, and only asks for a mistrial, we consider the failure to grant a mistrial an abuse of discretion only if the comments were so prejudicial that their effect could not have been removed by direction to the jury. *Id.*

Appellant, in part, makes a Fifth Amendment argument in this point, contending that the jury was allowed to make an inappropriate inference based on Appellant's refusal to participate in an interview with Dr. Harry. In Missouri, SVP proceedings are not considered criminal, but may be considered of a special statutory nature. *In re Care and Treatment of Spencer,* 103 S.W.3d 407, 418 (Mo.App. 2003). An alleged SVP, however, is afforded many rights conferred on a defendant in a criminal proceeding, such as right to counsel, right to jury trial, and right to a SVP determination by a unanimous verdict. *In re Care and Treatment of Salcedo,* 34 S.W.3d 862, 867 (Mo.App. 2001), superceded by statute on other grounds in *In re Care and Treatment of*

*Barlow,* 114 S.W.3d 328, 331 (Mo.App. 2003). The Fifth Amendment privilege against self-incrimination guaranteed by the United States Constitution protects an individual from being an involuntary witness against himself in any proceeding, criminal or civil, formal or informal, where his answers might incriminate him in future criminal proceedings. *State v. Booth,* 11 S.W.3d 887, 893 (Mo.App.2000).

The longstanding rule has been that in a criminal proceeding, no negative inference may be made based on a defendant's failure to testify. *Johnson v. Mo. Bd. of Nursing Adm'rs,* 130 S.W.3d 619, 628 (Mo.App.2004). Although the Fifth Amendment privilege may be asserted in a civil proceeding, it is not necessary that a civil claimant be shielded from all possible negative inferences, and civil claimants have been denied certain benefits and exposed to negative consequences resulting from the invocation of the privilege. *Id.* The negative inference associated with a civil claimant's refusal to testify in response to probative evidence against him may be drawn by the fact finder at trial or on summary judgment. *Id.* at 629.

In *Johnson,* the principles were applied and Johnson's refusal to answer pertinent questions on Fifth Amendment grounds was found to have justified an inference that, if Johnson had answered, her answers would have been unfavorable to her, as well as the inference that Johnson's testimony would have corroborated testimony given by the opposing side on the subject matter. *Id.* at 631. The case involved the revocation of Johnson's license as a professional nursing home administrator. *Id.* at 623.

The *Johnson* court also noted that a party seeking to benefit from such a negative inference must still make an affirmative showing of evidence to support a right to judgment. *Id.* at 632. Thus, "judgment may not be based on silence alone." *Id.*

We apply the principles stated in *Johnson* to SVP proceedings such as the one before us where an appellant refuses to cooperate in an evaluation ordered by the court. In other cases, such a lack of cooperation has been found akin to invited error, where the appellant challenged the sufficiency of the evidence. *See Spencer,* 103 S.W.3d at 419.

Given the circumstances of the case before us, including our determination in Point I that alcohol dependency provided a sufficient basis on which the jury to find Appellant suffers from a mental abnormality and is a sexually violent predator, we cannot find that the trial court abused its discretion in refusing to grant Appellant a mistrial. Point II is denied.

### Conclusion

The judgment of the trial court is affirmed.

GARRISON, P.J., and RAHMEYER, J., concur.