In the Matter of the CARE AND TREATMENT OF James D. COLLINS.

No. ED 82949.

Missouri Court of Appeals, Eastern District, Division Five.

May 18, 2004.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 8, 2004.

Application for Transfer Denied Aug. 24, 2004.

Emmett D. Queener, Columbia, MO, for appellant.

James R. Layton, Cheryl A. Caponegro Nield, Jefferson City, MO, for respondent.

GEORGE W. DRAPER III, Judge.

James Collins (hereinafter, "Collins") appeals from the trial court's judgment entered following a jury verdict finding him to be a sexually violent predator (hereinafter, "SVP") and committing him to the custody and care of the Department of Mental Health pursuant to Sections 632.480–.513 RSMo (2000).[1] Collins raises three points on appeal. First, Collins claims there was insufficient evidence to support the jury's verdict in that the verdict rested upon speculation by the jury as to Collins' ability to control his behavior. Second, Collins argues the trial court erred in denying his motion to dismiss the petition for commitment because he claims the State impermissibly instituted the commitment proceedings as a means of enforcing Collins' previous plea agreement. Finally, Collins challenges the constitutionality of the SVP laws as applied to him, in that he claims the laws are punitive in nature. We affirm.

Viewing the evidence in the light most favorable to the verdict, the facts adduced at the civil commitment trial are as follows: In 1982, Collins was dating K.M.'s mother, who lived in Valley Park. K.M. was five years old at the time. Collins frequently would ask to babysit K.M. while her mother worked. K.M. testified that when Collins babysat her, "it was always sexual" and Collins would "do sexual things" to her, such as touch her vagina and fondle her breast area. Collins would have K.M. touch his penis, and K.M. indicated "there was some oral sex involved."

---

1. All statutory references are to RSMo (2000) unless otherwise indicated.

These sex acts occurred approximately twice a week for over two years. K.M. testified Collins told her if she ever said anything to her mother about what happened that K.M. would not see her again. K.M. did not tell anyone about the abuse until she was fourteen or fifteen years old.

In 1989, Collins was dating J.U.'s mother when they lived in Valley Park. J.U. was nine years old. Collins often babysat for J.U. and her twin sisters. Collins usually invited J.U. to come to his house to spend the night with him. During Christmas vacation, J.U. spent the night with Collins and he had J.U. sleep in his bedroom because the heat to the second bedroom was shut off. J.U. testified Collins reached under her nightgown and fondled her. J.U. told Collins to stop, and shortly thereafter he complied with her request. Collins told J.U. not to tell anyone about what had happened.

J.U. also testified regarding another incident where Collins asked her to shower with him. While in the shower, Collins asked her to wash his penis and she complied. Collins again admonished J.U. from telling her mother about what happened, saying her mother would not love her anymore if she told. Additionally, J.U. said she remembered three more specific incidents similar to the ones that occurred previously, but she had a "vague feeling it happened a lot more." J.U. eventually told a babysitter about what happened, who in turn informed a school counselor, who contacted J.U.'s mother.

J.U. has two younger sisters who are twins. G.C., one of the twins, testified she and her twin were seven years old in 1989 when their mother was dating Collins. Collins babysat them and had the girls spend the night with him. G.C. testified to one incident where Collins had just stepped out of the shower and was laying on the bed with a towel draped over him.

He asked the twins if they wanted to touch "it," indicating his penis. G.C. stated he did not force them to touch him, but both girls touched him. G.C. never told anyone what transpired despite being interviewed by the Department of Family Services. G.C. indicated she was scared she and her twin sister would be taken away from their mother if she told them what happened with Collins.

Collins' fifth victim was L.A. Collins was a friend of the family who spent time with L.A.'s parents. Collins frequently went away with her family for the weekend. On Memorial Day weekend in 1990, Collins went with her family to go camping. L.A. was eleven years old. Collins came into L.A.'s room while she was sleeping in a bed she shared with her sister. L.A. woke up to find Collins touching her breasts, then fondling her genital area. L.A. asked him to stop several times, but Collins told her to be quiet so as to not wake up her sister. Collins told L.A. if she woke up her sister, he would "get her." At that point L.A. stayed quiet until Collins stopped touching her.

The next morning L.A. told her mother about the incident, but Collins said he simply fell into her bed and nothing happened. L.A.'s mother thought she was lying, so L.A. denied what had happened because she was scared and wanted Collins to "go away." L.A. did not talk to anyone about what happened until 1992, when she spoke to a school counselor. L.A. had heard about J.U.'s similar experience. L.A. convinced J.U. and K.M. to talk to a school counselor about what had happened to them.

Collins pleaded guilty in 1993 to one count of sodomy involving the incident with J.U. Collins was sentenced to five years imprisonment, but received a suspended execution of sentence and was placed on probation. As a condition of his

probation, Collins was ordered to attend sex offender treatment. While on probation, Collins was terminated from his outpatient sex offender treatment program for failing to attend. Collins sporadically saw a private therapist, but eventually stopped seeing him as well. Collins did however complete substance abuse treatment.

Collins received a violation report for not reporting to his probation officer and failing to complete sex offender treatment. Following a probation revocation hearing, Collins received 120 days "shock" incarceration. The Sexual Offender Unit at the Department of Corrections was aware of the allegations against Collins and his failure to complete treatment; thus it classified him as "high risk" to re-offend. Despite this assessment, Collins was placed on probation again upon completing the 120–day incarceration.

Collins' probation was revoked for a second time in November 1996 when he was arrested for burglary, failing to report to his probation officer, and not completing sex offender treatment. The burglary charge was dismissed. Collins was ordered to serve the underlying five year sentence upon revocation. Collins received no conduct violations while he was incarcerated. However, Collins failed to complete sex offender treatment after being offered two opportunities to do so while incarcerated.

Collins was scheduled for release in April 2003. In March 2003, the Department of Corrections informed the Attorney General's office that Collins might meet the definition of an SVP pursuant to Section 632.483.1. The State filed a petition per Section 632.486 to keep Collins in custody for an evaluation to determine whether he was an SVP and if so, to eventually commit him to a secure facility in the Department of Mental Health.

The probate court ordered Collins to undergo an evaluation to determine whether he fit the statutory definition of an SVP. Dr. Richard Scott (hereinafter, "Dr.Scott") conducted the first evaluation of Collins, but did not testify at the trial. Dr. Scott's written report was reviewed by the other evaluating doctors and discussed at length during trial. Dr. Scott interviewed Collins and reviewed a number of documents with respect to his personal, educational, medical, and criminal history.

Dr. Scott diagnosed Collins with "pedophilia, sexually attracted to females, nonexclusive," and with alcoholism. Dr. Scott indicated pedophilia fit the statutory definition of a mental abnormality under the SVP statutes. Dr. Scott found Collins presents a moderate to high risk for re-offending based on the following factors: (1) the presence of two sex offenses that were not prosecuted; (2) the presence of pedophilia; (3) a well-documented history of anger problems; (4) never being married; (5) the presence of one victim with several offenses against her; (6) failure to attend/complete sexual offender treatment; (7) a low rating with respect to treatment motivation; and (8) a history of alcohol dependence which acts as a trigger. Despite these factors, Dr. Scott concluded Collins did not meet the definition of "predatory" as defined under the SVP statutes because in Dr. Scott's opinion Collins "has an established pattern of only offending against individuals known to him with whom the relationship was not established or promoted for the primary purpose of victimization."

The probate court granted the State's request to conduct a second evaluation on Collins which was completed by Dr. Amy Phenix (hereinafter, "Dr.Phenix") who testified on the State's behalf. Dr. Phenix reviewed the same records Dr. Scott ex-

amined and conducted an interview and testing on Collins.

Dr. Phenix testified Collins was convicted of a sexually violent offense when he pleaded guilty to sodomy of J.U. Dr. Phenix agreed with Dr. Scott's diagnosis of pedophilia, sexually attracted to females, nonexclusive, and with alcoholism. Dr. Phenix also agreed with Dr. Scott's assessment that Collins had serious difficulty in the ability to control his behavior based on several of the factors Dr. Scott focused on. Dr. Phenix placed particular emphasis on Collins' lack of victim empathy, repeated failure in the treatment programs, and trouble with supervision while on probation.

Dr. Phenix testified that in her opinion, Collins is more likely than not to engage in predatory acts of sexual violence if not confined to a secured facility. Dr. Phenix disagreed with Dr. Scott's finding that Collins' behavior did not meet the definition of predatory in that she opined Collins cultivated the relationships with the victims' mothers in order to orchestrate the circumstance of being alone with the children by babysitting them.

Finally, Dr. Luis Rosell (hereinafter, "Dr.Rosell") examined Collins and testified on his behalf. Dr. Rosell reached the same diagnosis that Collins suffered from pedophilia and alcoholism, but stated these illnesses did not predispose Collins to commit sexually violent offenses. In Dr. Rosell's opinion, however, Collins did not suffer serious difficulty in the ability to control his behavior, and therefore, was not more likely than not to engage in predatory acts of sexual violence if released. Dr. Rosell emphasized the fact that Collins had not re-offended since the Memorial Day 1990 incident with L.A. Dr. Rosell testified about how Collins had been employed and engaged in adult relationships in the community when he was released. Dr. Rosell was concerned with Collins' alcoholism because Collins is more likely to re-offend when he has been drinking, but noted Collins has completed alcohol treatment. When addressing the issue of Collins' inability to complete sex offender treatment, Dr. Rosell recognized treatment was important, but it does not work for every person.

At the conclusion of all of the evidence, the jury returned a verdict finding Collins met the statutory definition of an SVP. The probate court ordered Collins committed to the Department of Mental Health for control, care, and treatment until his mental abnormality has so changed that is he safe to be at large. Collins appeals.

■ In his first point on appeal, Collins claims there was insufficient evidence to support the jury's verdict finding him to be a SVP. Collins argues the jury's verdict was not supported by substantial evidence of his inability to control his behavior, but rather, was based on speculation and conjecture by the jury.

Since we use the same evidentiary standards for commitment of SVPs as we use for criminal cases, when reviewing the sufficiency of the evidence we must determine whether the evidence presented to the jury was sufficient for a reasonable juror to have believed beyond a reasonable doubt that Collins is an SVP. *In re Care and Treatment of Amonette*, 98 S.W.3d 593, 600 (Mo.App. E.D.2003). We view the evidence in the light most favorable to the jury verdict, disregarding all contrary evidence and inferences. *In re Care and Treatment of Cokes*, 107 S.W.3d 317, 321 (Mo.App. W.D.2003). Conversely, we will not give the State the benefit of unreasonable, speculative, or forced inferences; nor will we supply missing evidence. *Id.*

■ The State must prove beyond a reasonable doubt that Collins meets the

statutory definition of a SVP. *In the Care and Treatment of Coffel*, 117 S.W.3d 116, 121 (Mo.App. E.D.2003). Section 632.480(5) defines a SVP as "any person who suffers from a mental abnormality which makes the person more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility" and as in Collins' case, has pleaded guilty to a sexually violent offense. A "mental abnormality" is defined as "a congenital or acquired condition affecting the emotional or° volitional capacity which predisposes the person to commit sexually violent offenses in a degree that causes the individual serious difficulty in controlling his [or her] behavior." *In re the Care and Treatment of Thomas*, 74 S.W.3d 789, 792 (Mo. banc 2002).

It is not disputed Collins suffers from a mental abnormality, which all three doctors diagnosed as pedophilia, sexually attracted to females, nonexclusive. What Collins argues is in dispute is whether there was sufficient evidence presented to the jury that he has serious difficulty in controlling his behavior. Collins argues we should focus on the fact he has been offense-free for six years while out in the community on probation despite possessing all of the factors which could cause him to re-offend.

The jury heard testimony from Dr. Phenix and Dr. Rosell regarding Collins' ability to control his behavior. Dr. Phenix testified it was not unusual for pedophilia to "wax and wane," citing the gap of time between when Collins abused K.M. in 1982 and had no reports of abuse until he encountered J.U. in 1989. Moreover, Dr. Phenix testified with respect to Collins' emotional capacity. In her opinion, Collins' failure to develop any empathy toward his victims predisposed him to re-offending, as well as his lack of a formal relapse prevention plan, and his inability to coop-

erate with authority while on probation. Dr. Phenix reached this conclusion noting Collins never grasped that the children were the victims and that his actions were hurtful, harmful, and a terrible trauma to them. Dr. Phenix described Collins' volition as being "so affected that he will continue and continue for many years to molest children." Moreover, Dr. Phenix testified Collins put himself into situations where he would be isolated with his victims by repeatedly asking to babysit. Dr. Phenix found this troubling in light of Collins' assertion to her during the interview that he would babysit again.

Dr. Rosell testified that even though all of these factors were present during Collins' release on probation, he has remained offense-free since May 1990. Dr. Rosell acknowledged Collins did not have a formal relapse prevention plan, but noted he has engaged in positive behavior to prevent relapse by controlling his drinking, obtaining employment, and being involved in an adult relationship. Dr. Rosell stated Collins did not indicate he would be willing to babysit children. Moreover, Dr. Rosell believed despite Collins' failure to complete treatment that this was not crucial because treatment did not always work for every person.

The jury's verdict reflects it believed Dr. Phenix's assessment of Collins' ability to control his behavior. It was within the jury's domain to make a credibility determination as to whose expert testimony it chose to believe. We find Dr. Phenix's testimony constituted sufficient evidence in the record upon which a juror could find beyond a reasonable doubt Collins had serious difficulty in controlling his behavior. Collins' first point is denied.

For ease of analysis, we will address Collins' third point next. Collins argues the trial court erred in entering judgment which confines him to the Department of

Mental Health in that the SVP laws are unconstitutional as applied to him. Collins claims these laws deprive him of due process and violate his protection against double jeopardy in that committing him is punitive in nature.

■ The United State Supreme Court has addressed both constitutional issues. In *Kansas v. Hendricks*, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), Hendricks challenged the validity of Kansas' SVP act as unconstitutional in that he claimed it violated his right to due process and to be free from double jeopardy. The Supreme Court upheld the validity of the act against these challenges holding the act's definition of "mental abnormality" satisfied substantive due process requirements. *Id.* at 521 U.S. at 360, 117 S.Ct. at 2082.

Moreover, the Supreme Court held Hendricks' confinement did not amount to a second prosecution and punishment for the offense of which he was convicted originally even though it followed a prison term. *Id.* at 521 U.S. at 370, 117 S.Ct. at 2086. The Supreme Court articulated several reasons in support of its finding that the act was not punitive in nature: (1) the act did not implicate either retributive or deterrent objectives; (2) the act did not require a criminal conviction as a prerequisite for commitment; (3) no finding of intent was required to commit the individual; (4) the confinement's duration was linked to treatment, in that the individual would not be held longer than to make his or her mental abnormality such that he or she would no longer be a threat to others; and (5) the amount of time a person could be committed was only "potentially indefinite" in that the act had a provision requiring the State of Kansas to prove beyond a reasonable doubt that the committed individual met all of the statutory criteria if they wished to continue to the commitment

beyond one year. *Id.* at 521 U.S. at 361–64, 117 S.Ct. at 2082–83. The Supreme Court relied on these reasons to buttress its holding that the act did not violate Hendricks' right to be free from double jeopardy.

In *In re Care and Treatment of Ingrassia*, this Court recognized the SVP statute provides for treatment and thus, "suggests that the statute is not punitive in nature...." *Ingrassia*, 103 S.W.3d 117, 119 (Mo.App. E.D.2002). Moreover, the Missouri Supreme Court applied the rationale articulated in *Hendricks* to a constitutional challenge to Missouri's SVP statutes in *Thomas, supra*. In *Thomas*, the Missouri Supreme Court recognized "for all relevant purposes, the Kansas and the Missouri sexual predator statutes are the same." *Id.* at 790. The Court relied on *Hendricks* and a companion case, *Kansas v. Crane*, 534 U.S. 407, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002), to find these cases "make clear that sexual predator statutes as enacted in Kansas and Missouri are constitutional so long as the mental abnormality causes the individual 'serious difficulty in controlling his [or her] behavior.'" *Thomas*, 74 S.W.3d at 791.

Here, we rely on the reasoning articulated in *Hendricks* and *Thomas*, and hold that based on Collins' diagnosis of pedophilia coupled with the evidence that he has serious difficulty in controlling his behavior, Collins' right to due process and to be free from double jeopardy have not been violated. Point denied.

■ Finally, Collins claims in his second point the trial court erred in denying his motion to dismiss the commitment petition because he claims the State impermissibly instituted the commitment proceedings as a means of enforcing Collins' previous plea agreement with the State. Collins argues this violates his due process rights in that by seeking the civil commitment, the State

is merely continuing its efforts to secure sex offender treatment which was part of the original plea agreement. Collins claims the State received the benefit of its plea bargain when Collins was incarcerated for failing to complete the sex offender treatment as a condition of his probation.

We recognize the validity of Collins' argument that the State received the benefit of its plea in that Collins was given probation, and upon failing to complete treatment, along with other probation violations, he was ordered to serve the remainder of his term in prison. However, as discussed in the previous point, there are significant differences in the goals of the criminal proceedings and the civil commitment proceedings, even though both proceedings in this case had a goal of providing treatment. Moreover, it is not presumed that the entering of a guilty plea to a sexual offense will result automatically in a civil commitment under the SVP statutes. *See Morales v. State*, 104 S.W.3d 432, 435 (Mo.App. E.D.2003). We note the State's plea agreement with Collins did not include a provision for future civil commitment. Finally, the process upon which civil commitment is based entails a different quantum of proof than the guilty plea, namely a psychological evaluation of Collins' present mental state when the petition is filed. Based on the foregoing, we cannot say the State has impermissibly sought to extend its plea agreement to ensure Collins receives sex offender treatment. Point denied.

The trial court's judgment finding civil commitment appropriate is affirmed.

SHERRI B. SULLIVAN, C.J., and PATRICIA L. COHEN, J.