In the Matter of the CARE AND TREATMENT OF Troy SPENCER, a/k/a Troy L. Spencer, Appellant.

No. 26241.

Missouri Court of Appeals, Southern District, Division Two.

Sept. 22, 2005.

Emmett D. Queener, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Alana M. Barragan–Scott, Asst. Atty., Gen., Jefferson City, for Respondent.

ROBERT S. BARNEY, Judge.

Appellant Troy Spencer ("Spencer") appeals from the judgment of the Circuit Court of Scott County, Missouri, which, following a jury trial, found Spencer to be a sexually violent predator ("SVP") pursuant to the Sexually Violent Predators Civil Commitment Act ("SVPCCA"), sections 632.480–513, and ordered him committed to the custody of the Department of Mental Health for secure confinement.[1] He now raises four points of trial court error, discussed below. This is the second appeal arising from the State's efforts to commit Spencer.[2]

The record reveals Spencer, who was fifty-four years old at the time of trial, began sexually abusing his daughter when she was six years old. On August 8, 1985, Spencer pled guilty to sodomy of his daughter. At the time of his guilty plea, Spencer estimated he abused his daughter between twenty-five and thirty times over a period of about four years. He stated that such abuse included touching his daughter's vagina and having her perform oral sex on him. Spencer rationalized he was disappointed in his wife for not taking care of herself physically and that his

---

1. Unless otherwise stated, all statutory references are to RSMo 2000. Rule references are to Missouri Court Rules (2005).

2. *See Spencer v. State,* 103 S.W.3d 407 (Mo. App.2003).

daughter had become more desirable to him than his wife.

After Spencer's guilty plea, a pre-sentence investigation ("PSI") was performed. The PSI revealed Spencer had also pressured a sixteen-year-old virgin into having sex with him when he was twenty-two years old. Spencer further admitted that when he was sixteen years old, at the encouragement of his older brother, he had molested his nine-year-old sister. Additionally, in the course of receiving mental health treatment, Spencer admitted to having had sex with a fourteen to sixteen-year-old girl in the Philippines while he was in the Navy.

On November 14, 1985, Spencer was sentenced to fifteen years in the Missouri Department of Corrections; execution of the sentence was suspended and Spencer was placed on supervised probation. In accordance with the terms of his probation, Spencer was ordered to admit himself to Fulton State Hospital for inpatient treatment; however, in violation of the terms of his probation, he failed to report to the treatment program and instead left the State of Missouri. Having violated the terms of his probation, Spencer's conditional release was revoked on February 27, 1986, and he was ordered to serve the fifteen years in prison which had previously been suspended.

While incarcerated, Spencer was placed in the Missouri Sex Offender Program ("MoSOP") four times between 1994 and 2000. Each time he was terminated for either being disruptive or refusing to participate.

In January of 2001, the State filed a petition alleging that Spencer was a SVP. On September 28, 2001, after a bench trial, the trial court entered its judgment and commitment order, having first found Spencer, "beyond a reasonable doubt, to be a sexually violent predator." *Spencer*, 103 S.W.3d at 413.

Subsequently, in May of 2002, the Supreme Court of Missouri held, *inter alia*, that in any commitment case under the SVPCCA, a jury must make a finding as to whether the person subject to commitment has serious difficulty controlling his or her behavior. *Thomas v. State*, 74 S.W.3d 789, 791–92 (Mo. banc 2002). As a result of the *Thomas* ruling, Spencer successfully appealed the trial court's commitment order on the grounds that the State had not proven, and the trial court made no finding, that Spencer had serious difficulty controlling his behavior. *Spencer*, 103 S.W.3d at 413. In light of *Thomas*, this Court "determine[d] that the judgment of the trial court should be reversed and the cause remanded to allow the State the opportunity to present evidence and make a submissible case under the *Thomas* standard." *Id.* at 416; *see also Thomas*, 74 S.W.3d at 791–92. On remand, the trial court was instructed to make a specific finding as to whether Spencer had serious difficulty controlling his behavior. *Id.* at 417. Spencer was tried a second time before a jury on March 17–19, 2004. As previously related, Spencer was found to be a SVP and committed to the custody of the Department of Mental Health for secure confinement. He now raises four points in his appeal, discussed below.

Under § 632.480(5) ... a sexually violent predator is

any person who suffers from a mental abnormality which makes the person more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility and who:

(a) Has pled guilty or found guilty, or been found not guilty by reason of mental disease or defect pursuant to section 552.030 ... of a sexually violent offense; or

(b) Has been committed as a criminal sexual psychopath pursuant to section 632.475 and statutes in effect before August 13, 1980.

*In re Care and Treatment of Burgess,* 147 S.W.3d 822, 830 (Mo.App.2004) (quoting § 632.480(5)).

At trial, the State ha[s] the burden of proving, beyond a reasonable doubt, that [the defendant] (1) has a congenital or acquired condition affecting his emotional or volitional capacity that predisposes [him] to commit sexually violent offenses to a degree that causes [him] serious difficulty controlling [his] behavior; and (2) that [he] is more likely than not to engage in predatory acts of sexual violence if not confined.

*In re Coffel,* 117 S.W.3d 116, 121 (Mo.App. 2003); *see also* § 632.480(2); § 632.480(5); § 632.495; *Thomas,* 74 S.W.3d at 791–92.

The same evidentiary standard is used for commitment of sexually violent predators as is used for criminal cases. *In re Care and Treatment of Amonette,* 98 S.W.3d 593, 600 (Mo.App.2003). Therefore, when reviewing the sufficiency of the evidence we must determine "whether the evidence presented to the jury was sufficient for twelve reasonable jurors to have believed beyond a reasonable doubt that appellant is a sexually violent predator." *Id.* We view the evidence in the light most favorable to the jury verdict, disregarding all contrary evidence and inferences. *Burgess,* 147 S.W.3d at 830. To reverse a jury's verdict when challenged as not supported by sufficient evidence, there must be a "complete absence of probative fact" in support of the jury's conclusion. *Smith v. State,* 148 S.W.3d 330, 335 (Mo.App. 2004).

In the present matter, the record reveals that the State's experts were Dr. Jay Englehart and Dr. Bruce Harry and that Dr. Luis Rosell testified for Spencer. Additionally, Dr. Harry Hoberman was called by the State to rebut Dr. Rosell's testimony. The evidence and inferences favorable to the judgment are summarized below.

Jay Englehart, M.D., is the senior psychiatrist and medical director at the Missouri Sexual Offender Treatment Center. Dr. Englehart supervised Spencer's treatment beginning in May of 2001, and had reviewed all of Spencer's records. Dr. Englehart diagnosed Spencer with the following disorders: pedophilia, attracted to females, non-exclusive type; delusional disorder, grandiose type; and personality disorder. Dr. Englehart described pedophilia as an attraction to underage persons for sexual gratification, which lasts for a period of more than six months, and causes significant problems for the person who has that attraction. Dr. Englehart based his pedophilia diagnosis on Spencer's past behavior such as the molestation of his daughter; his history of sexual activity with under-aged females; and a report by another psychologist containing a statement by Spencer that he is attracted to six to ten-year-old girls.[3]

Dr. Englehart also described "delusional disorder, grandiose type" as a disorder in which the subject has the false belief that he has powers or abilities that are much greater than what he has ever been able to demonstrate or that the subject believes he has special contact with God. He noted that a person with this disorder will maintain these beliefs despite evidence to the contrary. As for "personality disorder," Dr. Englehart described that disorder as one in which a person has certain proble-

---

**3.** "[A]n expert ... may be permitted to rely on such information as long as the information is not offered as independent substantive evidence and serves only as background for the expert's opinion." *Burgess,* 147 S.W.3d at 832.

matic personality traits which extend over a long period of time.

Dr. Englehart opined that one has to look at Spencer's entire history in order to make the proper psychological diagnoses. By reviewing Spencer's records, Dr. Englehart learned the following concerning Spencer's prison history.

According to his records, Spencer does not take personal responsibility for his past behavior, but instead blames his actions on his diet. Spencer was diagnosed with paranoid personality disorder in 1989, but refused treatment. Thereafter, he had an episode in 1992 where he was: writing furiously, pacing, refusing to wear clothes and was becoming increasingly agitated. At that time, a psychologist described Spencer's "content of speech as obviously delusional, grandiose, with excessive religiosity," and noted that "the form of [Spencer's] speech [was] as the word 'salad;'" a phrase which indicated the most severe form of thought disorder. Furthermore, Spencer claimed he had been released from prison through prayer when, in fact, he was still incarcerated. Also, Spencer believed that a therapist had a romantic interest in him while he was in MoSOP.

At one point, Spencer had generated over 400 pages of grievances, abuse and neglect allegations, and treatment team requests. Spencer also had numerous rule violations while incarcerated, and was known to write threatening letters demanding his release to various public officials.

Due to Spencer's bizarre behavior, Dr. Englehart made the decision to involuntarily medicate Spencer in December of 2001. The involuntary medication order did not take effect until June of 2002, during which time Spencer was known to stand on his head, explaining that getting more blood flow to his head would release stress and allow him to be stronger. He would also drink excessive amounts of water either to become water-intoxicated or to manipulate his way off the ward to use the restroom. Also he would frequently be verbally abusive of staff and other patients.[4]

After Spencer was involuntarily medicated his behavior improved markedly. Despite the apparent improvement, Spencer told Dr. Englehart that he would not continue taking medication if he were released.

At the time of the trial, Dr. Englehart was treating Spencer with the anti-psychotic medication, Risperdal. According to Dr. Englehart, when Spencer was not on anti-psychotic medication he was abusive towards others, he would become very religiously preoccupied and he would suffer from "thought disorder[s]."

Also testifying on behalf of the State was Dr. Bruce Harry, a forensic psychiatrist who works for the Department of Mental Health and for the University of Missouri, School of Medicine. Dr. Harry performed a court ordered evaluation of Spencer in 2004 in order to determine whether Spencer suffered from a mental abnormality and/or was a SVP. As part of his court ordered evaluation, Dr. Harry reviewed all documentation made available to him regarding Spencer's history. As a result, Dr. Harry diagnosed Spencer with the following disorders: pedophilia, sexually attracted to females, non-exclusive type; delusional disorder, grandiose type; and

---

4. On March 16, 2002, Spencer yelled to a staff member, "[y]ou are so fat I hope you have a heart attack and die. That's what I'm hoping for." At one point Spencer jumped on his bed took his clothes off and said to staff, "[y]ou want some of this?" while shaking his penis and threatening to urinate on the walls.

personality disorder not otherwise specified with narcissistic features. Dr. Harry explained that pedophilia was a "recurrent pattern of intense emotional and other affective or mood-type behaviors or simple acts of repetitive involvement with underage children. . . ." Further, he described a delusional disorder as "a mental disorder that has predominantly one kind of psychotic symptoms, which are delusions, which are fixed, false beliefs that are not shared by other people in the same culture or subculture."

During his testimony, Dr. Harry referenced Spencer's belief that he had a highly specialized relationship with God that no one else had and stated that such beliefs were evidence of "delusional disorder, grandiose type." He noted that Spencer's long pattern of holding himself out as superior to others was evidence of his "personality disorder with narcissistic features." He also explained that Spencer's history of writing letters to various officials demanding his release was further evidence of his feelings of "grandiosity" and "entitlement." Dr. Harry opined that Spencer had "very intense, distorted religious beliefs" which he used "as a way of venting his anger towards people in an unrealistic manner."

Dr. Harry also explained that Spencer's diagnosis of pedophilia was based upon Spencer's molestation of his daughter over a four-year period, which went on even after he was caught by his wife, as well as the sexual molestation his younger sister. Dr. Harry stated that although these incidents occurred over twenty years ago, Spencer *still* suffered from pedophilia. Additionally, Dr. Harry noted that Spencer had not successfully completed the sex offender treatment program.

According to Dr. Harry, Spencer met the statutory requirements for a SVP: he suffered from a mental abnormality that made it seriously difficult for him to control his behavior; he was more likely than not to engage in predatory acts of violence if not confined to a secure facility; and he is predatory because his primary purpose in molesting his daughter was victimization.

Dr. Luis Rosell, a clinical psychologist, testified for Spencer. Dr. Rosell, referencing risk factors from recidivism studies, opined that Spencer was not at a high risk to re-offend. However, when testimony revealed that Spencer currently had a girlfriend with two young children, who was also a nanny by profession, Dr. Rosell expressed his concern about Spencer being around the children in the event he was released.

Dr. Harry Hoberman, a forensic psychologist, was called by the State to rebut Dr. Rosell's testimony. Dr. Hoberman opined that Dr. Rosell misapplied the relevant risk factors when assessing Spencer's likelihood of re-offending.

█ In his first point on appeal, Spencer essentially contends there was "insufficient evidence to prove beyond a reasonable doubt" that his "diagnosed pedophilia presented a current danger to engage in predatory acts of sexual violence if not confined. . . ." Similarly, in his second point he asserts that his "diagnoses of delusional disorder and personality disorder, not otherwise specified," are "insufficiently precise to identify mental abnormalities limited to future risk of sexual offending, but rather suggest only a propensity to criminality. . . ."

We need not reach the issues set out in Spencer's second point because Spencer's first point does not dispute that pedophilia is a mental abnormality for purposes of the

SVPCCA.[5] Here, the expert testimony at trial clearly showed that Spencer presently suffers from pedophilia, and that such a mental abnormality predisposes Spencer to commit sexually violent offenses to a degree that causes him serious difficulty in controlling his behavior and that more likely than not he will engage in predatory acts of sexual violence if not confined. *In re Care and Treatment of Collins,* 140 S.W.3d 121, 126 (Mo.App.2004).

Spencer essentially argues the State did not prove his diagnosed pedophilia created a current danger that he would engage in predatory acts of sexual violence. As support, Spencer cites to Dr. Harry's testimony that there was no indication at the time of his examination that Spencer had current sexual fantasies regarding children.

As previously related, the State must prove Spencer suffers from a "mental abnormality," as defined in section 632.480(2), and that the mental abnormality causes the person "serious difficulty" in controlling his behavior. *Thomas,* 74 S.W.3d at 792. Additionally, section 632.480(5) requires the State to prove that the person is "more likely than not to engage in predatory acts of sexual violence if not confined." *Coffel,* 117 S.W.3d at 121. Such proof necessarily embraces the determination that Spencer presents a current danger to engage in predatory acts of sexual violence.

Viewing the evidence in the light most favorable to the jury verdict, *Burgess,* 147 S.W.3d at 830, the jury heard testimony from at least three experts which determined Spencer suffered from pedophilia. While Spencer argues that Dr. Harry testified there was "no indication at this time

or at the time of my examination" that Spencer had current sexual fantasies regarding children, nevertheless, Dr. Harry, as well as Spencer's expert, Dr. Rosell, both diagnosed Spencer as currently suffering from pedophilia, as did Dr. Englehart. The record also reveals Dr. Harry related that because Spencer sexually abused his daughter for four years, even after being caught by his wife, and because he had not completed a sex offender treatment program, it was more likely than not that Spencer would re-offend.

Dr. Rosell, testifying on behalf of Spencer, stated that based on relevant factors Spencer was not at a high risk to re-offend; however, Dr. Rosell's testimony was rebutted by Dr. Hoberman. Dr. Hoberman asserted that Dr. Rosell applied the term "incest offender" incorrectly when assessing Spencer's risk to re-offend. Dr. Hoberman related Spencer was not an incest offender because he had "acknowledged several . . . underage female victims who are outside his family." Dr. Hoberman also stated this factor "has a significant effect on the expected base rate for sex offense recidivism." He further opined that Dr. Rosell had improperly stated that Spencer had refused treatment, when in fact he had been terminated from treatment. Dr. Hoberman explained that "when you get kicked out of treatment once, let alone four times, that dramatically increases . . . your risk of re-offending."

Also, as previously recited, Dr. Englehart testified that Spencer's molestation of his daughter, his history of sexual activity with under-aged females, and his statement that he is attracted to six to ten-year-old girls were all relevant in his diag-

---

5. *See In re Care and Treatment of Pate,* 137 S.W.3d 492, 497–98 (Mo.App.2004) (holding that "personality disorder" qualified as mental abnormality where defendant suffered from an acquired condition, narcissistic personality disorder with antisocial features, demonstrated by an ongoing pattern of grandiosity, need for admiration, lack of empathy for victim and manifested by a pattern of sexual aggression targeting women).

nosis. Furthermore, there was testimony that Spencer did not take personal responsibility for the abuse of his daughter.

Additionally, the State presented evidence that when he was not on anti-psychotic medication, Spencer's behavior was very aggressive, abusive and erratic. Further, Spencer indicated that he was unwilling to medicate himself if he were released from commitment.

As best we discern, no expert witness has suggested that Spencer's pedophilia is in remission. Dr. Harry testified that Spencer's pedophilia has not gone away due to the mere lapse of time. It is apparent from the jury's verdict that it chose to believe Dr. Harry's determination that Spencer was more likely than not to re-offend. "It was within the jury's domain to make a credibility determination as to whose expert testimony it chose to believe." *Collins*, 140 S.W.3d at 126. The mere fact that Spencer may have lacked access to young girls while incarcerated cannot logically support his claim that the State failed to establish any recent, overt sexual acts. We find that the evidence was sufficient to prove beyond a reasonable doubt that Spencer was a sexually violent predator. Points One and Two are denied.

■ In his third and fourth points on appeal, Spencer raises two related arguments. In Point Three, he contends the trial court abused its discretion and plainly erred in denying his pretrial motion to exclude expert testimony on the necessary element of "serious difficulty controlling his behavior." Specifically, Spencer asserts the trial court erred in permitting Dr. Harry to testify that in his opinion Spencer has serious difficulty controlling his behavior, because there was an "insufficient foundation for the admission of Dr. Harry's testimony in that there is no reasonably reliable basis or methodology upon which psychologists can determine an individual's ability to control behavior." Similarly, in Point Four, Spencer contends the trial court abused its discretion and plainly erred in denying Spencer's motion to exclude expert testimony and in permitting Dr. Harry's testimony because the "determination of whether a person has shown serious difficulty controlling behavior is one lay persons can make on the basis of their own experience, rendering an expert opinion on this issue inadmissible."

We note that Spencer filed a pretrial motion to exclude expert testimony relating to whether Spencer has serious difficulty controlling his behavior. His motion was denied. The State then presented evidence in the form of Dr. Harry's testimony that Spencer has serious difficulty controlling his behavior. However, Spencer's counsel posed no objection to such testimony; accordingly, Spencer's third and fourth points cannot be considered in this appeal. *See Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 860 (Mo. banc 1993) (holding that "[s]ince there was no objection to the testimony of plaintiff's experts, there is no issue of admissibility presented and none is preserved for appeal"). Spencer now requests plain error review.

■ Rule 84.13(c) provides that: "Plain errors affecting substantial rights may be considered on appeal, in the discretion of the court, though not raised or preserved, when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." "Plain error review is seldom granted in civil cases and 'may not be invoked to cure the mere failure to make proper and timely objections.'" *Gill Constr., Inc. v. 18th & Vine Auth.*, 157 S.W.3d 699, 723 (Mo.App.2004) (quoting *Guess v. Escobar*, 26 S.W.3d 235, 241 (Mo. App.2000)).

More importantly, given the factual circumstances of this case, is the fact that plain error "cannot be used to 'revive issues already abandoned by selection of trial strategy or by oversight.'" *In re Swearingen,* 42 S.W.3d 741, 746 (Mo.App. 2001) (quoting *French v. Mo. Hwy. & Transp. Comm'n,* 908 S.W.2d 146, 153 (Mo.App.1995)). Here, on direct examination of his *own* expert, Dr. Rosell, defense counsel asked Dr. Rosell about his opinion as to whether Spencer had serious difficulty controlling his behavior. "Ordinarily, a party cannot complain on appeal about a procedure adopted in the trial court at his or her own request, nor may an appellant complain of alleged error, which by such person's conduct at trial, he or she joined in or acquiesced or invited." *Carter v. St.*

*John's Reg'l Med. Ctr.,* 88 S.W.3d 1, 19 (Mo.App.2002). That rule attends here and precludes any finding of manifest injustice or miscarriage of justice resulting from the admission of Dr. Harry's testimony relating to whether Spencer had serious difficulty controlling his behavior. *See id.* Points Three and Four are denied.

The judgment is affirmed.

SHRUM, P.J., and GARRISON, J., concur.